**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALFA INTERNATIONAL SEAFOOD, INC.
7850 NW South River Drive
Medley, Florida  33166

FORTUNE FISH & GOURMET
1068 Thorndale Avenue
Bensenville, Illinois 60106

HANDY SEAFOOD INCORPORATED
700 E Main St #101
Salisbury, Maryland 21804

DULCICH, INC. d/b/a PACIFIC SEAFOOD GROUP
16797 SE 130th Avenue
Clackamas, Oregon 97015

PACIFIC SEAFOOD PROCESSORS ASSOCIATION
1900 West Emerson Place
Suite 205
Seattle, Washington 98119

TRIDENT SEAFOODS CORPORATION
5303 Shilshole Avenue NW
Seattle, Washington 98107

WEST COAST SEAFOOD PROCESSORS ASSOCIATION
650 NE Holladay St., Suite 1600
Portland, Oregon 97232

LIBBY HILL SEAFOOD RESTAURANTS, INC.
4517 W. Market Street
Greensboro, North Carolina  27407

NATIONAL FISHERIES INSTITUTE
7918 Jones Branch Drive
Suite 700
McLean, Virginia 22102

   Plaintiffs

   v.           Case No. _____

THE HONORABLE PENNY PRITZKER
Secretary of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

THE HONORABLE KATHRYN D. SULLIVAN
Under Secretary of Commerce for Oceans & Atmosphere
    and NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue, N.W.
Washington, D.C. 20230

EILEEN SOBECK
Assistant Administrator for NOAA Fisheries and
   Head of National Marine Fisheries Service
1315 East-West Highway
Silver Spring, Maryland 20910

SAMUEL D. RAUCH III
Deputy Assistant Administrator for Regulatory Programs,
National Marine Fisheries Service
1315 East-West Highway
Silver Spring, Maryland 20910

                    Defendants.
_____

## COMPLAINT AND PETITION FOR REVIEW

**Introduction**

1.      On December 9, 2016, the Deputy Assistant Administrator for Regulatory Programs,

        National Marine Fisheries Service issued a Midnight Final Rule ("Rule" or "Final Rule")

        that will dramatically increase the price of seafood to consumers both in groceries and in

        restaurants.  The Rule would require seafood importers to trace the origin of the fish they

        import to either the specific boat that caught the full fish or a "single collection point," to

        the day the fish was caught and to the sector of the specific ocean where the fish was

        caught.  *See* Final Rule, 81 Fed. Reg. 88,975 (Dec. 9, 2016), denoted as Exhibit A and

        available  at <https://www.gpo.gov/fdsys/granule/FR-2016-12-09/2016-29324>.   The

Rule would require each person or entity in the chain of distribution prior to entry into the United States, from the fisherman or broker in Peru, Iceland, Indonesia, Canada, and the United States, through the processor in Ecuador, Thailand, Vietnam, or Norway, to collect and maintain these data and pass them on to the importer so that the importer could enter data into sixteen fields in a Government-operated database for the wild-caught or farmed fish subject to the Rule.  Harvest to import traceability would force seafood processors to adopt costly changes to the way in which seafood is processed, thereby significantly increasing the cost of seafood to the consumer.  The fundamental issue presented by this case is whether the Department of Commerce ("Department"), in attempting to beat the January 20, 2017 transition of Administrations, cut corners by:  (i) refusing to disclose for public comment the data on which it relied to identify the seafood species subject to the Rule, in violation of the notice-and-comment provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706 ("APA"); (ii) failing to address in the preamble to the Rule public comments that raised APA concerns about the agency's refusal to reveal the data on which it relied to select the species to be governed by the Rule, again in violation of the APA; (iii) failing to discuss and evaluate alternative regulatory options as required by the Regulatory Flexibility Act ("RFA") and by Executive Order No. 12866; (iv) presenting an economic analysis under the RFA that is inconsistent with the laws of supply and demand, thereby violating the Department's RFA obligations to small businesses, including Plaintiffs; (v) presenting arguments in the preamble in support of the Rule that are inconsistent; and (iv) permitting a low-level bureaucrat to issue a binding final rule absent a valid delegation of authority from the Secretary.  Plaintiffs believe that the Rule must be vacated or enjoined because the

3

Secretary violated the APA in various ways and also violated the RFA by failing to

consider less expensive alternative means as required by the RFA.  The increased cost of

the Rule cannot be debated.  Statements by the Department in the preamble suggest that

increased costs will range between hundreds of millions of dollars to one billion dollars

per year.

2. The Rule is aimed at seafood harvesters, distributors, and others who import any of one

of fifteen (15) species of fish and seafood into U.S. commerce.[1]  The stated purpose of

the Rule is to detect fish that have been caught illegally, or that are otherwise unreported

or unregulated ("IUU") before they enter the United States – even though the Department

and NOAA in particular have ample authority under existing law to investigate and

punish IUU fishing entering U.S. commerce, and even though there are more

sophisticated, more effective, and less costly means of accomplishing that goal, including

satellite surveillance.  The Rule also seeks to deter distribution of fraudulently labeled

---

[1]     The species listed in the Rule (50 C.F.R. § 300.324(a)(2)) are as follows:

    1. Atlantic Cod
    2. Pacific Cod
    3. Blue Crab
    4. Red King Crab
    5. Mahi Mahi
    6. Grouper
    7. Red Snapper,
    8. Sea Cucumber
    9. Shark
    10. Swordfish
    11. Albacore (tuna)
    12. Bigeye (tuna)
    13. Skipjack (tuna)
    14. Yellowfin (tuna)
    15. Bluefin (tuna)

The agency has deferred enforcement of the Rule to shrimp and abalone indefinitely.  *See id*. at §
300.324(a)(3).

seafood, even though according to the Government's own studies, most mislabeling occurs after seafood has entered the United States and even though many U.S. importers subject imported seafood to DNA testing to preclude fraud at the border.[2] The Rule would accomplish its goals by requiring that fish imported into the United States be traceable to the boat or to a single collection point, time, and place that the fish was caught, and that this information be entered into a master computer program operated by the Government.

3.      The Rule, were it to go into effect, would remake the way in which seafood is caught, processed and imported around the World. These changes to food processing practices in every nation would reduce exports into the United States and would dramatically increase the cost of catching, processing and importing seafood. Fishermen, many of whom are subsistence workers operating in Third World Nations, would have to keep track of each fish harvested, as would the brokers who purchase the seafood from the fisherman, and processors who handle catches from hundreds of fishermen would have to be able to trace each piece of fish to a specific vessel and specific fishing events or to a single collection point. This would require significant changes in the way fish are processed overseas. It would also affect the way in which fish are processed in the United States, because these requirements would also apply to all domestically caught or farmed seafood covered by the Rule that are shipped outside the U.S. for processing and re-imported back into the United States.

4.      The Rule would increase the cost of seafood to consumers--at both supermarkets and restaurants--at the very time when Public Health officials are encouraging Americans to

---

[2]      *See* <http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentRegulatory Information/Seafood/ucm/419982.htm>

integrate more fish into their diets as way of reducing the risk of cardiovascular disease and as a way of improving fetal neurodevelopmental outcomes via increased maternal seafood consumption.  *See* USDA, *Scientific Report of the 2015 Dietary Guidelines Advisory Committee* at 2 ("The overall body of evidence examined by the DGAC identifies that a healthy dietary pattern is higher in vegetables, fruits, whole grains, low- or non-fat dairy, seafood, legumes, and nuts"); DIETARY GUIDELINES FOR AMERICANS 2010 (DGA) (recommendation for fish intake is "at least 8 ounces of cooked seafood per week"); FDA-EPA Proposed Seafood Advice June 2014, "Fish:  What Pregnant Women and Parents Should Know" (concluding that seafood "contains important nutrients for developing fetuses, infants who are breastfed, and young children.  Fish provides health benefits for the general public.  Many people do not currently eat the recommended amount of fish"); American Heart Association 2002 (recommending the consumption of 2 to 3.5 oz (~200 grams) of cooked portions of fish, particularly fatty fish high in omega-3 fatty acids, at least two times weekly for risk reduction of cardiovascular disease); Susan K. Raatz, Jeffrey T. Silverstein, Lisa Jahns and Matthew J. Picklo Sr., *Issues of Fish Consumption for Cardiovascular Disease Risk Reduction*, 5 NUTRIENTS 1081-97 (2013) ("Increasing fish consumption is recommended for intake of omega-3 (n-3) fatty acids and to confer benefits for the risk reduction of cardiovascular disease (CVD).  Most Americans are not achieving intake levels that comply with current recommendations.").  The Rule would have the opposite effect, driving up prices for consumers and in the process discouraging average Americans from eating seafood.

## I.  JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to:

a.     28 U.S.C. § 1331, which confers original jurisdiction over all civil suits arising

under the Constitution and the laws of the United States, and 28 U.S.C. § 2201

(authorizing declaratory relief), 5 U.S.C. § 601 *et seq.* (Regulatory Flexibility

Act), and 5 U.S.C. § 701 *et seq.* (judicial review provisions of the Administrative

Procedure Act).

b.     Venue is proper pursuant to 28 U.S.C. § 1391(e).

## II.     PARTIES

**A.     Plaintiffs**

6.     Plaintiff Alfa International Seafood, Inc. ("Alfa Seafood") is a family-owned, family-

operated seafood importer and distributor located in Miami, Florida.  It has fewer than

100 employees and is considered a small business under the Small Business Act.  It is a

member of the National Fisheries Institute.  Alfa Seafood currently imports and

distributes four species subject to the Department's Rule on seafood traceability, as

follows:  (1) Mahi Mahi; (2) Swordfish; (3) Yellowfin Tuna; and (4) Shark.  *See* 50

C.F.R. § 300.324(a)(2); 81 Fed. Reg. at 88,997 (col. b).  Alfa Seafood also imports the

other species subject to the Rule, with the exception of Abalone, Atlantic Cod, Pacific

Cod, and Sea Cucumber.  The new Rule would have a devastating and immediate

economic impact on Alfa Seafood.  The Rule would require processors in Ecuador and

Peru, where most of Alfa's seafood originates, to change the way in which fishermen or

brokers document their catches and the way in which processors actually process these

catches, so that fish imported into the United States can be traced to a particular fishing

event or to a single collection point.  This will add hundreds of thousands of dollars to

Alfa Seafood's cost of importing fish, assuming that the processors abroad are willing to

modify the way in which they process fish.  Under the Rule, Alfa Seafood would be required to hire an additional three full-time employees devoted exclusively to entering data to comply with the Rule at a cost of approximately $195,000 per year with benefits. Both of these costs would drive up prices significantly, drive down demand and would affect negatively the financial stability of Alfa Seafood.

7.   Plaintiff Handy Seafood Incorporated ("Handy Seafood") is one of the oldest family owned and operated businesses in Maryland and the oldest seafood processor in the United States, having been established in 1894.  Handy Seafood is a Maryland corporation with its principal place of business in Salisbury, Maryland and facilities in Crisfield, Maryland.  It is a member of the National Fisheries Institute and has approximately 80 employees in the United States, making it a small business under the regulations implementing the Small Business Act.  Handy Seafood is the importer of record of two species subject to the Rule, namely Grouper and Blue Crab.  *See* 50 C.F.R. § 300.324(a)(2).  Blue Crab is subject to the Rule because, according to NOAA, it is the subject of mislabeling, *e.g.*, seafood fraud.  *See* 80 Fed. Reg. 66,867, 66,870 (Oct. 30, 2015).  This is so even though Handy and many other seafood importers DNA test their seafood to ensure that the labels are accurate.  If Handy's processors modified their processing methods to segregate product by Aggregate Harvest Report and gathered the information required by the Rule, both the price of Blue Crab to Handy, as well as at retail, would increase by approximately 28%.  The price of Grouper would increase by about 8% with a similar impact at retail.  These price increases would have a significant adverse impact on the financial stability of Handy.  A 28% increase in the cost of Blue Crab would render it non-competitive in the marketplace.  An 8% cost increase in

Grouper would have a significant negative impact on demand with numerous readily available substitute seafood products.  Thus as a result of the Rule, Handy Seafood's costs will increase and those increases will have to be passed on to its customers.

8.      Plaintiff Pacific Seafood Group ("Pacific Seafood") is a family-owned business established in 1941, to provide fresh, quality seafood to the Portland, Oregon market.  It also is a member of the National Fisheries Institute.  Over the past seventy-five years, Pacific Seafood has grown to become a vertically integrated global company with over 2,600 employees at over 40 facilities in 7 states.  The company now includes harvesting vessels, aquaculture, processing, distribution and retail facilities, , and is committed to ensuring its seafood is harvested consistent with the highest standards of sustainability.  As the importer of eight species subject to the Rule, Pacific Seafood will be directly, immediately and adversely affected by the Rule because it will drive up its costs substantially and unnecessarily.

9.      Plaintiff West Coast Seafood Processors Association ("WCSPA"), located in Portland, Oregon, is a trade association comprised of shore-based seafood processors in California, Oregon, and Washington.  WCSPA's members are committed to promote good science, sustainable fishing practices, habitat conservation, production and sale of safe products and compliance with conservation laws and regulations.  WCSPA became the first seafood industry group in the United States to endorse and implement the United States Fisheries Industry Principles for Responsible Fisheries, which was developed by a steering committee representing fishermen, processors, aquaculture producers and seafood buyers in the United States.  The changes the Rule makes will adversely and immediately affect WCSPA members by driving up their costs substantially and

imposing bureaucratic hurdles for no justifiable reason. WCSPA detailed these costs and made additional arguments against the proposed rule in comments filed April 4, 2016 (referenced as Exhibit B and available at

<https://www.regulations.gov/document?D=NOAA-NMFS-2015-0122-0012>.

10.     Plaintiff Libby Hill Restaurants, Inc. ("Libby Hill") is a third generation, family-owned restaurant franchisor with four franchise restaurants in North Carolina--two in Greensboro, one in Reidsville and one in Mount Airy. It is a small business within the meaning of the Small Business Act. The company is a vibrant player in the "fast casual" restaurant category in North Carolina and has provided wholesome seafood meals to North Carolina families for over fifty years. The Department's Rule would force Libby Hill to charge more for many popular seafood menu items, thus hurting its business and driving customers to less healthy fast-food options. Further, because of the very real possibility that certain species under the Rule may become less available in the U.S. market, Libby Hill may have to contend with supply interruption that will make it more difficult to attract return customers expecting to be able to rely on the same menu from visit to visit. Because return customers are essential in the fast-casual category of the restaurant industry, such uncertainty could have a debilitating impact on Libby Hill's business.

11.     Plaintiff National Fisheries Institute ("NFI"), a non-profit organization located in McLean, Virginia, is the largest organization exclusively focused on public policy issues affecting the American commercial seafood industry. Founded in 1947, NFI represents hundreds of its business members across the country in every facet of the seafood industry. As detailed in its April 12, 2016 comments to the proposed rule, *see* Exhibit C

available at <https://www.regulations.gov/document?D=NOAA-NMFS-2015-0122-0098>, NFI has been a vocal supporter of multiple reforms aimed at detecting and reducing IUU fishing and seafood fraud alike.  NFI was an early supporter of the Food Safety Modernization Act, (Pub. L. No. 111-353 (Jan. 4, 2011)), and that legislation's food traceability mandate.  As a condition of membership, all NFI members join the Better Seafood Board, a group committed to eliminating seafood fraud and other violations of the economic integrity requirements established and enforced by the Food and Drug Administration.  NFI has been an active participant in international efforts to address IUU fishing.  For instance, an NFI employee was detailed to the Department of State delegation that drafted and negotiated the Port State Measures Agreement, a treaty that gives the Department and other Federal agencies new authorities to detect and punish illegally-harvested fish in U.S. commerce.  *See* Pub. L. No. 114-81 (Nov. 5, 2015) (implementing the Port State Measures Agreement following the Senate ratification of Treaty Document No. 112-4 (Apr. 3, 2014)).  NFI members include importers of record that import in the aggregate all of the species designated in the Rule as "priority species." NFI filed voluminous comments to the proposed rule on April 12, 2016 (referenced as Exhibit C, *supra*).  Those comments detail the extraordinary costs that would be incurred by each importer of record merely to enter the trillions of bytes each year required by the Rule.  Much larger costs, though, would be incurred by processors, brokers and harvesters who would have to change the way in which they collect and process seafood to generate the traceability data required by the new rule.  These costs would dramatically increase the cost of seafood to the consumer and drive down demand, thereby adversely

11

affecting the entire industry and forcing many family-owned and operated importers, which are members of NFI, to abandon major product lines and even go out of business.

12.     Plaintiff Trident Seafoods Corporation ("Trident") is the largest vertically integrated seafood company in the United States.  Trident is a closely-held corporation located in Seattle, Washington, and has facilities in five states and three countries outside the United States.  Trident harvests, processes, imports, distributes, and exports multiple "priority species" under the Rule, including Atlantic Cod, Pacific Cod, Mahi Mahi, Swordfish, Yellowfin Tuna, Bigeye Tuna and shrimp.  At its annual peak, the company employs about 7,000 people in the United States and 10,000 people worldwide.  The Rule would impact Trident by raising the cost of bringing U.S.-harvested seafood back into U.S. commerce from overseas processing, thus harming domestic fishermen in Alaska, Washington, Oregon, and California who depend on the company and others like it for demand for their fish.  The Rule would apply to all U.S.-harvested priority species that Trident supplies to U.S. customers, thus in effect expanding the scope of the Rule to apply to domestically harvested fish from its primary processing operations made into finished products abroad but that is ultimately shipped back to the United States to meet domestic demand.  The Rule also makes it more likely that Trident's exported seafood will have to meet the same or more onerous traceability requirements, as U.S. trading partners respond to the Rule by imposing regulatory barriers intended to frustrate U.S. seafood exports.  Because even small increases in costs encountered in seafood markets abroad can make those markets unprofitable for U.S. exporters, the Rule ultimately could have the effect of closing foreign markets to U.S. fishermen.

13.   Plaintiff Pacific Seafood Processors Association ("PSPA"), located in Seattle,

Washington, is a nonprofit trade association comprised of major seafood processing

companies with operations in Alaska and Washington.  PSPA was founded in 1914, and

is the oldest continuously operating seafood trade association in the United States.  PSPA

member companies are committed to the sound management and long-term health of

fishery resources and the marine environment upon which those resources depend.  They

are also committed to providing good jobs and a safe, rewarding work environment to

their employees, economic benefits to the region, and high quality, healthful seafood

products to consumers.  PSPA commented on the Department's proposed rule, pointing

out numerous flaws in the Department's methodology and the likelihood that the Rule as

proposed will not effectively address either IUU fishing or seafood fraud in the U.S.

market (referenced as Exhibit D and available at <https://www.regulations.gov/

document?D=NOAA-NMFS-2015-0122-0049>.

14.   Plaintiff Fortune Fish & Gourmet ("Fortune Fish") is a privately-owned seafood

wholesaler, processor, and distributor in Bensenville, Illinois, and Minneapolis,

Minnesota.  Fortune Fish, which was founded in 2001, is an Illinois limited liability

partnership and principally serves customers across nine Midwestern states.  The

company employs 300 workers, making it a small business under the regulations

implementing the Small Business Act.  Fortune Fish is the importer of record and

processes and distributes multiple priority species, including Atlantic Cod, Blue Crab,

Mahi Mahi, Swordfish, Bigeye Tuna, Yellowfin Tuna, and Bluefin Tuna.  Fortune Fish

has grown to become one of the largest seafood and specialty food distributors in the

country, processing high quality seafood from all over the world, importing shrimp,

squid, dover sole, swai, snow crab and tilapia, in addition to the priority species listed above. The company also includes a gourmet division handling over 6,000 items with a strong presence of imported product. Given Fortune Fish's reliance on imported priority species, the Rule would impose across-the-board costs on Fortune Fish's product line. Those increased costs will have a serious adverse effect on Fortune Fish.

**B.     Defendants**

15.   Defendant Penny Pritzker is the Secretary of Commerce and is responsible for all functions of Commerce, including the National Marine Fisheries Service ("NMFS," "NOAA Fisheries," or "the agency") within the National Oceanic and Atmospheric Administration ("NOAA"). NMFS asserts jurisdiction over the importation of seafood and was responsible for developing the proposed and Final Rule. Pritzker is sued in her official capacity.

16.   Kathryn D. Sullivan is the Under Secretary of Commerce for Oceans & Atmosphere and NOAA Administrator and is responsible for and supervises the operations of NOAA and NMFS. Sullivan is sued in her official capacity.

17.   Eileen Sobeck is the Assistant Administrator for NOAA Fisheries and the head of NMFS, the agency within Commerce responsible for developing the proposed and Final Rule. Sobeck, who was appointed as Assistant Administrator by Sullivan, is sued in her official capacity.

18.   Samuel D. Rauch III is the Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service and the individual who signed and issued the Rule. Rauch, who reports to Sobeck, is sued in his official capacity. Rauch is neither an "Officer" nor "inferior Officer" within the meaning of U.S. Const. art. II, § 2, cl. 2.

## Ill.   BACKGROUND

**A.**   **International and National Efforts to Regulate Seafood Harvesting**

19.   Various international and domestic organizations, both governmental and non-governmental, concerned with sustainable seafood, including Plaintiffs, have long recognized the need to improve international regulation of seafood to better ensure that harvesting events or catches are legal, regulated, and reported and that seafood sold to the consumer whether at a supermarket or restaurant is accurately labeled or portrayed.

20.   Since 1993, the United Nations Food and Agricultural Organization ("FAO") has advocated a global solution to this global problem, in accordance with international law, and has urged nations to refrain from unilateral trade-related measures when responding to the challenge of IUU fishing.  *See* FAO, Agreement To Promote Compliance With International Conservation And Management  Measures By Fishing Vessels On The High Seas (1995); United Nations Fish Stock Agreement (1995) (Agreement for the implementation of the provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the conservation and management of straddling fish stocks and highly migratory fish stocks); FAO International Plan of Action to Prevent, Deter and Eliminate Illegal, Unreported and Unregulated Fishing, ¶ 66 (FAO: Rome, 2001) ("Trade-related measures must be adopted and implemented in accordance with international law, including principles, rights and obligations established in the WTO agreement, and implemented in a fair, transparent, and non-discriminatory manner. Trade-related measures should only be used in exceptional circumstances, where other measures have proven unsuccessful to prevent, deter and eliminate IUU fishing, and only

after prior consultations with interested states.  Unilateral trade-related measures should
be avoided.").

21.  In addition, in 2009, FAO adopted an Agreement on Port State Measures to Prevent,
Deter and Eliminate Illegal, Unreported and Unregulated Fishing (FAO, Rome, 2009).
Finally, in 2015, the UN resolved to negotiate a new agreement to maintain the biological
diversity of marine areas beyond national jurisdictions, which could include the
management of deep sea fisheries, and also targeted the elimination of subsidies that
contribute to IUU fishing in its Sustainable Development Goals.  "BIORES (June 23,
2015) ("UN member states agree to negotiate high seas biodiversity pact,"); Sustainable
Development Goals, United Nations, "Transforming Our World: The 2030 Agenda for
Sustainable Development" (September 25, 2015) (Goal 14.6).

22.  In addition, and in parallel, the United States and eleven other countries have negotiated
disciplines on subsidies related to IUU fishing in Chapter 20 of the proposed Trans-
Pacific Partnership.  And, a number of international regional fisheries management
organizations (RMFOs) – including some in which the United States participates – have
adopted management and enforcement measures aimed at reducing IUU fishing.  The
Western and Central Pacific Fisheries Convention, the International Convention for the
Conservation of Atlantic Tunas, the Northwest Atlantic Fisheries Organization, and the
Commission for the Conservation of Antarctic Marine Living Resources all have
developed a variety of catch documentation and trade tracking requirements that enable
governments to monitor the movement of fish and fish products through international
commerce.

23.     The European Union ("EU") has implemented a catch certification program to combat

IUU fishing that requires a large amount of data points.  However, under a bilateral

arrangement, NOAA negotiated in 2009, U.S. exporters are exempt from these

requirements.  Instead, NMFS need only certify that the seafood was harvested in

compliance with the MSA as follows:

> I certify to the best of my knowledge that the items in the shipment listed
> herein were caught in compliance with the Magnuson-Stevens Fishery
> Conservation and Management Act (16 U.S.C. 1801 /et seq./) and other
> applicable state and Federal conservation and management laws and
> regulations as specified in the U.S.-EU Agreement dated November 6,
> 2009.

Although the EU catch certification program requires an importer to collect and maintain

certain data, the importer is not required to enter those data into a database, as is the case

with the Rule at issue here.  Nor is the importer required to collect the type of detailed

"collection spot" specific information required by the Rule.

24.     The United States also has acted to combat IUU fishing.  The Magnuson-Stevens Fishery

Conservation and Management Reauthorization Act of 2006 ("MSA"), among other

things, required the Secretary of Commerce to define the term "illegal, unreported, or

unregulated fishing."  16 U.S.C. § 1826j(e); *see* 50 C.F.R. § 300.201 (defining term).

The MSA does not address seafood fraud.

25.     In addition, the Presidential Task Force on Combating IUU Fishing and Seafood Fraud

developed a set of recommendations aimed at combatting both IUU fishing and seafood

fraud apart from the concept of a traceability mandate.  *See* Presidential Task Force on

Combating IUU Fishing and Seafood Fraud: Action Plan for Implementing the Task

Force Recommendations (2015).

26.     In November, 2015, Congress enacted and President Obama signed into law The Illegal,

        Unreported, and Unregulated (IUU) Fishing Enforcement Act. *See* Pub. L. No. 114–81.

        129 Stat. 649 (Nov. 5, 2015).  With its passage, the United States became the twentieth

        country to ratify the FAO Port State Measures Agreement, which will take legal effect

        when ratified by twenty-five countries.  The United States has likewise continued to offer

        strong support to a number of other multilateral endeavors worldwide.

27.     Further, advances in technology have made it easier, less expensive and less intrusive to

        police IUU fishing through detailed GPS surveillance of the oceans which permits

        regulators to pinpoint fishing vessels in prohibited areas and DNA testing to combat

        seafood fraud by permitting importers to confirm that the species on the label matches the

        species in the package.  For example, Global Fishing Watch, a new, free satellite-based

        surveillance system powered by Google, allows governments, as well as journalists and

        citizens, to monitor fishing and enforce fishing restrictions world-wide.  The Pew

        Charitable Trusts has launched a similar technology, called Project Eyes in the Sky,

        aimed at detecting pirate fishing.  See Brady Dennis, *How Google is Helping to Crack

        Down on Illegal Fishing--From Space*, Washington Post (Oct. 4, 2016).

**B.     NMFS  Unilaterally Seeks to Regulate Seafood Harvesting Through Notices**

28.     It is against this backdrop of multilateralism and advances in technology that NMFS

        proposed a unilateral, trade-related, supposedly risk-based seafood traceability program.

        The process started with the issuance on April 30, 2015 of a one-page notice by a

        National Ocean Council Working Group soliciting comments on the principles to be used

        to identify fish species likely to be most at risk of IUU fishing or seafood fraud.  *See* 80

        Fed. Reg. 24,246 (April 30, 2015) (referenced as Exhibit E and available at

<https://www.federalregister.gov/documents/2015/04/30/2015-10125/presidential-task-force-on-combating-illegal-unreported-and-unregulated-iuu-fishing-and-seafood>).  The agency received 155 comments in response to its Notice.

29.   On August 3, 2015, two months after the comment period closed, NMFS published a Notice and request for comments on a set of seven principles for identifying "at risk" species and a draft list of those species, both developed by a Working Group within NMFS.  *See* 80 Fed. Reg. 45,955 (Aug. 3, 2015) (referenced as Exhibit F and available at <https://www.federalregister.gov/documents/2015/08/03/2015-18945/presidential-task-force-on-combating-illegal-unreported-and-unregulated-iuu-fishing-and-seafood>).  There is no indication that any of the public comments were taken into account in fashioning the seven guiding principles.

30.   Four of the principles appear to relate solely to IUU:  (i) enforcement capability, (ii) catch documentation, (iii) complexity of chain of custody and processing, and (iv) history of violation.  *See id*. at 45,956.  The lower the enforcement capability, the poorer the catch documentation, the more complex the chain of custody and the greater the history of violation for any given species, the more likely that species would be identified as "at risk" for IUU fishing.

31.   Three of the seven principles relate solely to seafood fraud:  (i) history of species substitution; (ii) history of mislabeling; and (iii) human health risks as a result of substitution or mislabeling.  *See id.*

32.   Based on these seven principles, the Working Group identified thirteen at-risk species or seventeen, if one distinguishes the five types of tuna: (1) Abalone; (2) Atlantic Cod; (3) Blue Crab; (4) Dolphinfish (*i.e.*, Mahi Mahi); (5) Grouper; (6) King Crab; (7) Pacific

Cod; (8) Red Snapper; (9) Sea Cucumber; (10) Shark; (11) Shrimp; (12) Swordfish; and

(13) Tuna (albacore, bigeye, bluefin, skipjack and yellowfin).  No data whatsoever were

provided to support the Working Group's determinations.  The Working Group also

refused to take into account the country of origin even though it is known to everyone in

the industry that certain nations are better at policing their seas and enforcing

international norms than others.  Nonetheless, the Working Group asserted that it "does

not believe it is useful or appropriate to establish a principle based on country of origin,"

even though three of the four IUU principles must necessarily take country of origin into

account.  *Id*. at 45,961 (col. a).  The deadline for receipt of comments was originally set

at September 2, 2015, but was extended to September 11, 2015 "to provide further

opportunity for the public to review and provide thoughtful comment."  80 Fed. Reg.

50,270 (Aug. 19, 2015).

33.    New Zealand filed comments questioning the rationality of NMFS's approach.  *See* New

Zealand Comments (referenced as Exhibit G and available at

<https://www.regulations.gov/document?D=NOAA-NMFS-2014-0090-0307>).  The

Government of New Zealand observed the obvious, namely that the

> proposed principles effectively discriminate against States with
> responsible management regimes, if the same rule is applied across all
> countries of origin.  The seafood industries of States with effective
> regimes will be required to comply with the requirements of those
> management regimes, as well as with additional requirements under the
> US's proposed policy.  We believe that the most significant IUU risk lies
> with those States that do not have effective management regimes, and
> therefore the efforts of the IUU Task Force are best focused here.  We
> consider that seafood fraud is often a domestic issue, and therefore
> something that exporting States may have little control over.

*Id.*

34.    On October 30, 2015, three months after issuing its initial notice, and less than two months after the close of the comment period, NMFS issued a document entitled Notice of Determination signed by Samuel D. Rauch, III, deputy assistant administrator for regulatory programs within NMFS.  *See* 80 Fed. Reg. 66,867 (Oct. 30, 2015) (referenced as Exhibit H and available at

<https://www.federalregister.gov/documents/2015/10/30/2015-27780/presidential-task-force-on-combating-illegal-unreported-and-unregulated-iuu-fishing-and-seafood>).  The issuance set out sixteen "at risk" species as follows:  (1) Abalone; (2) Atlantic Cod; (3) Blue Crab; (4) Dolphinfish (*i.e.*, Mahi Mahi); (5) Grouper; (6) King Crab (red); (7) Pacific Cod; (8) Red Snapper; (9) Sea Cucumber; (10) Sharks; (11) Shrimp; (12) Swordfish; and (13) Tuna (albacore, bigeye, skipjack and yellowfin).  Bluefin, a form of tuna, was dropped from the list.

35.    In the October 30 issuance, the agency responded to comments which urged that its findings should be "data driven," by stating that it "partially agrees."  *Id.* at 66,872 (col. a).  However, the agency did not indicate the classes of data that were used and it refused to disclose the actual data on which it relied to identify the "at risk" species, stating that "[d]etailed presentation of the data considered by the Working Group and its deliberations is protected from disclosure because of data confidentiality and enforcement implications."  *Id.* at 66,870 (col. a).

36.    With respect to comments, such as those submitted by the Government of New Zealand, questioning the reasonableness of treating all countries the same in terms of enforcement, the "Working Group acknowledge[d] that the risk of IUU fishing will vary depending on the country of the origin . . . . [but] the Working Group does not believe it is useful or

appropriate to establish a principle based on country of origin." *Id*. at 66,872 (col. b). The agency's response is at best gobbledygook and at worst internally inconsistent. At no point did the agency indicate why it would not be useful or appropriate to take into account country of origin.

37.     Many of its other responses to significant comments were also internally inconsistent. For example, some commenters questioned the utility of using the complexity of the chain of custody as a principle for identifying IUU fishing or seafood fraud. The agency responded by agreeing that the "Working Group does not believe that a complex chain of custody or high level of processing necessarily signifies fraudulent product or a connection to IUU fishing." *Id*. at 66,873 (col. c). However, the agency then went on to note that it was retaining complexity of the chain of custody as principle for identifying "at risk" species because in complex environments, "there are more opportunities for mixing illegally caught fish with legally caught fish and for mislabeling." *Id*. No data were offered for this proposition or for that matter any proposition presented in the Determination.

**C.     Proposed Rule--Scope**

38.     Three months after issuing its Determination, NMFS issued its proposed traceability rule. *See* 81 Fed. Reg. 6210 (Feb. 5, 2016) (referenced as Exhibit I and available at <https://www.regulations.gov/document?D=NOAA-NMFS-2015-0122-0002>). The proposed rule would apply to seventeen species, sixteen of which were preliminarily selected by a National Ocean Council Task Force in its October 30, 2015 Determination. Those selections were carried forward with the addition of Bluefin Tuna into the proposed rule.

39.     The data ostensibly supporting the selection of these seventeen species were missing

from the proposed rule, as they were from the prior issuances.  Plaintiff NFI and others

questioned the propriety of selecting seventeen species through a secret process without

revealing the data underlying the selection.  The agency, apparently unmindful of the

notice and comment requirements of the APA, stated that "details of the results have not

been included because much of the data reviewed are sensitive and/or confidential, and

could compromise the integrity of individual businesses, system or enforcement

capability if released."  80 Fed. Reg. at 66,872 (col. a) (Exhibit H).  This makes no sense

since NOAA regularly issues press releases touting the enforcement actions that it has

taken.  NMFS's use of secret data to make policy carried over into both the proposed and

final rules, where no data were presented justifying the selection of the "at risk" species

even though many questioned the propriety of this form of secret rulemaking.  *See*

Exhibit C (NFI Comment at 28-31 (April 12, 2016)).  The agency's lack of transparency

was highlighted in the comment of the Canada's Ministry of Fisheries and Oceans at 2

(April 11, 2016) which observed that "there remains a lack of transparency in terms of

how the list of at-risk species has been developed . . . ."

40.     Even though the agency was issuing a Notice of Proposed Rulemaking, it requested "that

comments not be submitted on this proposal that are duplicative of those submitted on the

list of species and contain no new information."  81 Fed. Reg. at 6213.

41.     The proposed rule would require U.S. seafood importers of record (or customs brokers

acting on their behalf) to collect and report to the Government at the point of entry into

U.S. commerce a long list of traceability data documenting  the point of harvest up to the

point of entry as a condition of importing certain wild-caught and farmed seafood into the

23

United States for each of the seventeen species on the NMFS at-risk list.  The proposed

rule also required the importer to possess records documenting the chain of custody

between harvest and importation.  Those importers that do not comply with these new

traceability requirements would have their imports barred from entry into the U.S.

market.

42.     Under the proposed rule, the following data would have to be collected and reported

electronically to the "International Trade Database" of Customs and Border Protection

("CBP"):

      a. Name of harvesting vessel(s).
      b. Flag state of harvesting vessel(s).
      c. Evidence of authorization of harvesting vessel(s).
      d. Unique vessel identification(s) of harvesting vessel(s) (if available).
      e. Type(s) of fishing gear used in harvesting product.
      f. Names(s) of farm or aquaculture facility.
      g. Species of fish (scientific name, acceptable name, AND an AFSIS number.
      h. Product description(s).
      i. Name of product(s).
      j. Quantity and/or weight of the product(s).
      k. Area(s) of wild-capture or aquaculture location.
      l. Date(s) of harvest or trip(s).
      m.  Location of aquaculture facility [Not relevant to wild caught seafood]
      n.  Point(s) of first landing.
      o.  Date(s) of first landing.
      p.  Name of entity(ies) (processor, dealer, vessel) of first landing.
      q.  NMFS-issued IFTP number.

43.     The proposed rule would make it a violation of the MSA to import any at-risk seafood

without a valid IFTP or to submit inaccurate or incomplete traceability information.  In

addition, importers would be required to maintain records documenting the chain of

custody of the product from harvest to point of importation.  The rule proposed that these

records would be retained for five years and would be subject to review by NOAA upon

request.  Furthermore, import shipments of fish or fish products subject to the new

traceability program could be selected for inspection, or the related records could be subjected to audit, in order to verify the information submitted at entry.

44.     These new requirements for importers have no equivalent domestic counterpart and the new Rule would not apply to domestic seafood, with the exception of U.S. wild-caught and farmed fish exported for processing and reimported into the United States.  Despite what NMFS maintains in the preamble, there is no comparable chain-of-custody requirement under U.S. domestic law.  The fisheries of the United States generally are not required to provide the government with this extent of data.  Separate pieces of this information are required from a number of different participants along the long length of the domestic seafood supply chain, but not all of it is required of any one participant in the supply chain.

45.     In contrast to the new requirements for imported products, for like domestic products, there is no requirement that the fish be traced throughout the chain of custody from harvest to entry into U.S. commerce.  The closest U.S. law comes to such a traceability program is a pilot program of the U.S. Food and Drug Administration for food products that have been the subject of safety concerns in recent years.  This pilot program is mandated by Section 204 of the Food Safety Modernization Act of 2010.  The Bioterrorism Act of 2002 also requires limited traceability for all foods.

**Proposed Rule--Costs to Implement**

46.     The proposed rule referenced an Initial Regulatory Flexibility Act Analysis ("IRFAA") under the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq*.  An IRFAA must indicate the number of small entities subject to the regulation, a description of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule, along with the

professional skills necessary to prepare the documents. *See* 5 U.S.C. § 603(b). The agency is also required to publish its IRFAA in the Federal Register. *See id*. at § 603(a).

47.    Here, the IRFAA was never published in the Federal Register. It did not indicate the number of small entities that would be affected by the rule. Nor did it describe the reporting, recordkeeping and compliance burdens or even the levels of skills necessary to comply with the rule. The IRFAA contained no assessment of costs in dollars and cents other than noting that the additional registration fees would total $60,000 and that data entry would cost across the entire seafood sector less than $250,000. The agency acknowledged that the rule would increase costs to those in the chain of distribution and hence to consumers but made no effort to quantify or even to assess those costs. Instead, the agency concluded, without the benefit of any data, that

> [t]he permitting, electronic reporting and recordkeeping requirements proposed by this rulemaking would build on current business practices (e.g., information systems to facilitate product recalls, to maintain product quality, or to reduce risks of food borne illnesses) and are not estimated to pose significant adverse or long-term economic impacts on small entities.

81 Fed. Reg. at 6220 (col. b).

48.    Sometime in October 2016, the Office of Management and Budget ("OMB") published through its website a table of revised costs under the Paperwork Reduction Act. The OMB table lists data entry costs across all species at $6,475,000 for 215,000 entries. OMB estimated that there would be 215,000 import events subject to the rule and that it would take approximately 101,000 hours to enter the data or about 30 minutes for each container of seafood. OMB did not assess the economic impact on small businesses of the proposed rule.

26

49.   The proposed rule's impact on small entities, such as four of the named plaintiffs and

members of NFI, will exceed $100 million per annum.  The agency underestimated the

direct reporting costs alone by many orders of magnitude.  For example, the agency

calculated, using mystery data, that the total cost nationwide to input data into the sixteen

fields for all seafood subject to the Rule imported into the United States would cost less

than $250,000.  The OMB estimate for data entry alone was about 100-fold greater than

the agency initially determined with most of that cost burdening small entities.  The data

entry costs, however, pale in comparison to other costs the agency never even considered.

Indeed, using OMB and Small Business Administration numbers, the Rule's total costs

could exceed $1 billion annually.  The agency's inability to accurately calculate the data

entry costs of the proposed rule calls into question the viability of the secret data that the

agency used to determine at-risk species.  Imported seafood normally moves from the

fisherman to a broker to a processor, perhaps to a secondary processor, and finally to the

importer of record.  The importer of record is the entity responsible for entering the data,

and it usually distributes the seafood to wholesale and retail outlets as well as to

restaurants.  Seafood may be harvested by small day boats that bring their catch to shore

daily where it is sold to a broker.  The typical broker will purchase seafood from scores

of fisherman.

50.   The proposed rule would require that all seafood be matched to a harvesting event.

Therefore, traceability starts with the broker; brokers normally commingle all catches of

a given species purchased that day.  Under the proposed rule, though, brokers in Peru,

Ecuador, Mexico, New Zealand and elsewhere would have to segregate each catch by

species before sale to the processor.  The processor in turn would have to keep each catch

segregated by harvest event through the entire processing cycle; this is not currently done.  Segregating seafood through processing will add significantly to the cost of a catch.  These cost increases would be passed on to the processor that in turn will pass them on the retailer or restaurant which will pass them on the consumer.  The proposed rule acknowledged that it would lead to increased costs, but those costs were never quantified making it impossible for the agency to assess the rule's impact.

51.    More than 100 comments were filed in response to the proposed rule, many from foreign nations, *e.g.*, Australia, Canada, Norway, Peru, Thailand, India, and Malaysia, that were concerned with the agency's unilateral approach to an international issue and the agency's refusal to take country of origin into account even though there is a wealth of data that would have permitted the agency to have done so.  One comment was filed by another U.S. Government agency--the Small Business Administration's Office of Advocacy.  SBA found that the IRFAA failed "to analyze viable alternatives," as required by the RFA and underestimated the cost of compliance.  SBA commented that "[i]f a small business processed only ten containers per year, the costs would be close to $200,000 for one business," assuming $20,000 cost per container to enter data.  SBA Letter at 4, referenced as Exhibit J available at <https://www.regulations.gov/document?D=NOAA-NMFS-2015-0122-0110>.

**D.    Final Rule**

52.    On December 9, 2016, NMFS issued its Final Rule; that rule, like the proposed rule, was not issued by the Secretary of Commerce but rather by Defendant Rauch, a fifth-tier Department employee.  There is no published notice that the Secretary's rulemaking

authority has been delegated to any inferior officer or employee within the Department, including Rauch.

53.    The Rule followed the basic framework set forth in the proposed rule.  The agency, though, made some cosmetic changes.  First, it temporarily suspended the Rule's applicability to two so-called "priority" species (shrimp and abalone), although both species remain subject to certain provisions of the Rule.  Second, it reduced from five years to two years the period over which importers would be required to retain records.  Third, the Department touts modifications in the Final Rule that permit a broker or processor that purchases seafood from small fishing boats at a single collection point on the same day to trace and transfer the data in the aggregate, as opposed to on a boat-by-boat basis.  Although this modification was designed to reduce somewhat the costs associated with data entry by reducing the amount of data necessary to be collected, maintained and transferred, it would have no effect, however, on the increased costs that would be incurred by processors who still need to modify the way in which their seafood is processed so that each piece of fish can be traced back either to a single harvest event, in the case of larger boats, or to a single collection point, in the case of smaller boats. The Department did not evaluate these costs.

          1.    **Final Regulatory Flexibility Act Analysis**

54.    Notwithstanding these modifications, in its Final Regulatory Flexibility Act analysis, the agency increased the data entry costs imposed by the new Rule.  Exhibit K, available at <http://www.iuufishing.noaa.gov/LinkClick.aspx?fileticket=4Aq2H0tTRyc%3d&tabid=2913&portalid=33&mid=14280>.

55.     While the Initial Regulatory Flexibility Act Analysis pegged those costs at about $250,000 per annum across the entire seafood sector, the revised Final Analysis set the upper bound for data entry costs at approximately $20 million for the first year and about $18 million thereafter.  *See* Exhibit K at 14.

56.     However, the Final RFA Analysis, like the Initial Analysis, did not address a much larger category of costs associated with the Rule.  Specifically, the new Rule, like the proposed rule, would alter the way in which seafood is processed and those processing changes occasioned by the Rule would increase costs throughout the distribution chain.  Indeed, the agency acknowledged that processors in foreign nations "will incur costs as a consequence of this rule, in particular the chain-of-custody recordkeeping in cases of complex supply chains, that may be either passed through to U.S. consumers or result in a decline in exports to the U.S. market.  Both of these responses to the Program could affect prices in the U.S. market."  81 Fed. Reg. at 88,986 (col. a).  The agency, however, made no attempt to quantify these costs for purposes of its Final RFA Analysis or the cost-benefit requirements of Executive Order No. 12886.

57.     The Final Rule would increase processing costs from a low of $520 million per year to a high of more than $1billion per year.  This is so because processors would still need to segregate catches throughout the entire processing cycle so that the information required by the Rule could be preserved and transferred to the importer for ultimate entry into the Government's database.  The modification that would permit harvests from small boats to be aggregated would have little to no effect on these increased costs.  For example, suppose that each of twenty brokers were to purchase seafood from five small boats at the same collection point on the same day.  Further suppose that the twenty brokers re-sold

the catches to a single processor.  Under the proposed rule, each broker would have to segregate each boat's catch and the processor would have to maintain that segregation for the 100 harvest events (five harvest events for each of twenty brokers) purchased and processed that day.  Notwithstanding the discussion in the preamble, it appears that under the Final Rule, the broker would be permitted to aggregate his five catches, but the processor would still be required to segregate the individual purchases from each of the twenty brokers throughout the processing cycle.  Segregated processing, which is considerably more expensive than batch processing, is not currently practiced anywhere in the World.

58.   The Final RFA Analysis did not address or consider the increase in processing costs caused by the Rule, even though those costs dwarf the data entry costs.  Instead, the Final RFA Analysis stated that "[t]he impacts [sic] of this action on trade (import volume) and prices for the affected seafood products are expected to me [sic] minor."  Exhibit K at 7. No data were provided to support this statement.  Indeed, the Government's own documents indicate that the total costs of the Rule will be close to a $1 billion per year. The only cost-related study cited by the agency estimates that the EU traceability rule as implemented in Sweden resulted in a ten percent increase in the cost of seafood in Sweden.  According to the agency, the EU program is comparable to the one in the Final Rule, although the European countries that commented on the proposed rule disagreed on this point.  However, using the 10 percent increase posited by the study and relied upon by the agency suggests that the Rule would cost nearly $1 billion per annum depending on the total value of imported seafood per annum.  These cost increases, which were acknowledged, but never measured or estimated by the agency, would drive down

demand which in turn would drive down sales and immediately and irreparably injure plaintiffs.

59.    The Final RFA Analysis also concluded that "[w]hen considering the possible economic impact of this rule on seafood trade, analysis of U.S. and European Union (EU) trade data pertaining to the designated priority species shows that most countries exporting the applicable products to the U.S. market are already compliant with IUU-related traceability requirements for seafood exported to the EU market.  Thus, the fishing entities in these countries, and the associated businesses in the supply chain, should already be able to comply with the new U.S. requirements (see list of countries at Table 2 below)."  *Id*.  The agency goes on to state that "the harvest event data required to be provided under the U.S. program aligns very closely with those data on the harvest event required by the European Union catch certification program."  81 Fed. Reg. at 88,985 (col. c).  This necessarily assumes that processors outside the EU are all subject to the same regulatory catch certification requirements, independent of their nationality, and further, that processors in those countries have opted to incur the added costs of segregating catches, as would be the case if the EU Catch Certification program imposes similar requirements as the Rule.

60.    Neither is the case.  First, the EU imposes different requirements depending on the nationality of the importer.  For example, in November 2009, NOAA negotiated an arrangement with the EU in which all imports into the EU from U.S. exporters need only complete this form:  <http://www.seafood.nmfs.noaa.gov/pdfs/us_catch_certificate 1109.pdf>.  Second, the form requires some of the same data points as required by the Rule, such as FAO Area and range of dates of catch, but omits most of the other data

points.  This EU requirement is far less burdensome than the requirements imposed on

EU exporters to the U.S. by the Rule.  Inasmuch as the EU's treatment of seafood differs

as a function of the country of origin, it is virtually impossible to compare the regulatory

costs of seafood imported into the EU with those regulatory costs of the new Rule unless

it is done on a country-by-country basis.  This was not done.

61.     The RFA also requires agencies to discuss alternatives to the contemplated rule and "why

each one of the other significant alternatives to the rule considered by the agency which

affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(5).  In its Final RFA

Analysis, the agency claims that it considered various alternatives including "a no action

alternative," and "various combinations of data reporting and recordkeeping for supply

chain information."  81 Fed. Reg. at 88,994 (col. c).  The Final RFA Analysis fails to

reveal the various combinations of data reporting and recordkeeping, as required by the

RFA.  Nor did the Final RFA Analysis indicate, also as required by the RFA, "why each

one of" these significant alternatives "was rejected."  *Id*. at § 604(a)(5).  The only

alternatives that appear to have been discussed in the separate full analysis were those

that would have been more onerous and costly than the proposed rule.  *See* Analysis at

24.  Moreover, the agency did not perform a cost-benefit analysis on a data field-by-data

field basis, as suggested by the Governments of Canada, China, Iceland, Indonesia, and

Norway.

## 2.     Selection of At-Risk Species Using Secret Data

62.     The Final Rule, like the proposed rule and the prior Determinations, did not reveal the

data or other information relied on by the agency to select the "at-risk" or "priority"

species that would be subject to the traceability regulation.  Commenters, including NFI,

voiced concern in their comments to the proposed rule and earlier Determination, that rulemaking based on "secret information" was inappropriate.  In the Final Rule, the agency did not respond to these comments.

63.     The agency's unwillingness to reveal the data and other information on which it based its "at-risk" species selections necessarily limited the robust give-and-take normally associated with real notice-and-comment rulemaking.  As a result, many of agency's justifications for selecting specific species were either circular, nonsensical or gibberish.

64.     For example, commenters questioned the propriety of applying the Rule to Atlantic and Pacific Cod.  *See* 81 Fed. Reg. at 88,984(col. b).  First, with respect to IUU fishing, the agency's only justification was that "[w]hile not widespread, there have been reports to NOAA of illegal fishing of both species."  The nature of the reports, the persons providing the reports, the age of the reports or any other information about these "reports" is not revealed.  In short, there is no evidence of IUU fishing of cod presented in the preamble to either the proposed rule or the Final Rule.  Second, the agency claims cod is susceptible to mislabeling or species substitution.  No evidence is presented for this "susceptibility," nor is there any evidence that substitution actually occurs.  Moreover, the agency lacks jurisdiction over "seafood" fraud; FDA, not NMFS, has jurisdiction over seafood labeling.  *See* Food, Drug, and Cosmetic Act § 403 (prohibiting misbranding of food products); 21 C.F.R. § 1.276; MSA § 307.  When FDA, the agency responsible for regulating seafood labeling, tested cod for accurate labeling, it found that 15 of the 15 samples tested were properly labeled.

65.     The agency's treatment of Bluefin Tuna is equally revealing.  The agency acknowledges that Bluefin Tuna was "determined," using the agency's secret data, "to be at a lower risk

of IUU fishing and seafood fraud than other tuna species."  The agency nonetheless designated the species "at risk" to "avoid possible concerns that one species of tuna may be treated differently than others."  81 Fed. Reg. at 88,979 (col. a).  The concerns of disparate treatment, though, are not real; they are merely possible.  Moreover, one purpose of the rulemaking was to discriminate among species, making the Department's treatment of Bluefin Tuna in the Rule nonsensical, and emblematic of the Rule's broader problems.

### 3.    The Compliance Date Is Irrational

66.    Just as the agency's original cost estimates were two to three orders of magnitude too low, its compliance date of January 1, 2018, in the Final Rule is nonsensical.  For certain priority species, such as Pacific Cod, the fish are harvested more than one year before the date of importation.  As a result, fish that were harvested before the Rule was issued would be subject to it on importation even though no data would have been collected.  As to those fish, the Rule is effectively retroactive in violation of *Bowen v. Georgetown Hosp.*, 488 U.S. 204 (1988).  Moreover, effective implementation, as the agency acknowledges, requires the agency to publish "compliance guidance as well as a 'plain language' description of the final regulation."  81 Fed. Reg. at 88,983 (col. c).  None of this has occurred, making timely implementation that much more difficult.

## IV.   Claims

### Count 1
### Secret Rulemaking
### Violation of the Notice and Comment Requirements of the Administrative Procedure Act
### (5 U.S.C. § 553)

67.    Plaintiffs incorporate by reference paragraphs 1-66.

68.   Notice and comment rulemaking presupposes that the basis for the agency's decision, including the data on which it relied, are shared with the public as part of the agency's "notice."

69.   Here, the agency has refused to share the data that it relied upon to determine the species subject to the proposed rulemaking thereby limiting public comment.

70.   Accordingly, the agency has violated the notice-and-comment requirements of the APA, and the Final Rule should therefore be vacated.

**Count 2**
**Inadequate Agency Record to Support Final Rule**
**Arbitrary & Capricious**
**(5 U.S.C. §§ 553 & 706)**

71.   Plaintiffs incorporate by reference paragraphs 1-70.

72.   An agency's regulation must be supported by the rulemaking record. The Final Rule and its accompanying record lack any data to support the agency's selection of specific at-risk species and the agency has refused to reveal its data publicly.

73.   The preamble to Final Rule is also internally inconsistent in the follow respects:

a.      The preamble states that "NMFS does not agree that harvesters and farmers will be in a position to demand payment for traceability data, and commenters did not provide quantitative or qualitative information regarding the likelihood of such risks. There is no indication that the imposition of existing catch documentation systems (*e.g.*, the EU system) resulted in measurable increases in the cost of seafood." 81 Fed. Reg. at 88,985 (col. c). Yet, the only study cited by the agency in its RFA Analysis states that prices for fish in Sweden increased by 10 percent as a result of the EU traceability program, which is a more than a measurable increase, especially for those on fixed incomes. *See* RFA at n.6 (citing Blomquist, J., *et al.*, *Price Premiums for Providing Eco-labelled Seafood:*

*Evidence from MSC-certified Cod in Sweden*. 66 JOURNAL OF AGRICULTURAL ECONOMICS, 690–704 (2015).

b.      The preamble states that "NOAA agrees that IUU fishing is not a concern directly related to the aquaculture industry." 81 Fed. Reg. at 88,977 (col. b). But the agency goes on to state that "evidence exists," but none is cited, that aquaculture products have been the subject to misrepresentation, that aquaculture programs "are likely to be subject to foreign laws," but again none is cited, and that "some imported fish products," but again none is identified, "are sourced from both wild capture and aquaculture operations." *Id*.

c.      With respect to both Atlantic and Pacific Cod, as examples, NOAA acknowledges that IUU fishing is "not widespread." *Id*. at 88,984 (col. b). But NOAA goes on to note that the species are being included in the Rule because, among other reasons, "there have been reports to NOAA of illegal fishing of both . . . species." *Id*. The nature or number of these reports is not revealed.

74.     A rule that is not supported by the record and is internally inconsistent is by definition arbitrary and capricious and should be vacated as such.

**Count 3**
**The Final Rule Was Issued by an Employee Lacking Authority to Issue a Rule**
**in Violation of the Executive Powers, Take Care and Appointments Clauses of the**
**Constitution**
**(U.S. Const., art. II, § 1, cl. 1, art. II, § 3 & art. II, § 2, cl. 2; 16 U.S.C. § 955; 16 U.S.C. §**
**5504(d); 16 U.S.C. § 2436(a); 16 U.S.C. § 1855(d) and APA §§ 4 & 10)**

75.     Plaintiffs incorporate by reference paragraphs 1-74.

76.     Rulemaking authority for the Department of Commerce is vested in the Secretary or her designees. Various provisions governing NMFS and which are cited as the bases for this Rule, authorize the Secretary of Commerce to issue implementing rules. *See* 16 U.S.C. §

955; 16 U.S.C. § 5504(d); 16 U.S.C. § 2436(a); and 16 U.S.C. § 1855(d).  None of these

provisions authorizes redelegation.

77.    Even if redelegation were proper, there is no evidence that the Secretary delegated her

rulemaking authority to Mr. Rauch or to someone who may have redelegated it down the

chain to Mr. Rauch, who is neither an officer nor an inferior officer, as those terms are

used Article II of the Constitution.

78.    Even if the statutory scheme authorized the Secretary to delegate her rulemaking

authority and even if that authority had been delegated, a delegation of an "employee," as

opposed to an "Officer," violates the Executive Powers, Take Care and Appointments

Clauses of the Constitution.  *See* U.S. Const., art. II, § 1, cl. 1, art. II, § 3, art. II, § 2, cl. 2,

respectively; *Buckley v. Valeo*, 424 U.S. 1, 141 (1976) ("[t]hese administrative functions

[which include rulemaking] may therefore be exercised only by persons who are

'Officers of the United States.'"); *Consumer Energy Council of Am. v. Federal Energy

Regulatory Comm'n*, 673 F.2d 425, 474 (D.C. Cir. 1982); *Bandimere v. U.S. SEC*,

__F.3d__, No. 15-9586 (10th Cir. Dec. 27, 2016).

79.    A rule issued in violation of the Constitution and the agency's organic legislation must be

vacated under 5 U.S.C. § 706(2)(A), (B) and (C).

### Count 4
### The Agency Lacks Authorization to Regulate "Seafood Fraud"
### (APA § 10; MSA § 307; FDCA § 403)

80.    Plaintiffs incorporate by reference paragraphs 1-79.

81.    The Administrative Procedure Act requires agencies to include "reference to the legal

authority under which the rule is proposed[.]" 5 U.S.C. § 553(b)(2).  Neither the proposed

nor the Final Rule referenced any statute that would authorize the Secretary of Commerce to regulate seafood fraud or seafood labeling.

82. The required statutory reference was omitted because Congress has not authorized the Secretary of Commerce or any of her delegatees to issue legislative rules affecting seafood fraud.  By contrast, the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs, possesses such authority.  *See* FDCA § 403.

83. The agency's designations of "at-risk" or "priority" species were based on secret data concerning both IUU fishing, over which the Secretary arguably has authority, and seafood fraud, over which she does not.  The agency did not reveal the weight given to each.  As a result, Rauch's issuance of the Final Rule was "in excess of ... authority" and therefore, the Rule must be vacated in its entirety.

**Count 5**
**Agency Failed to Properly Perform a Regulatory Flexibility Analysis**
**(5 U.S.C. § 601 *et seq.*)**

84. Plaintiffs incorporate by reference paragraphs 1-83.

85. The Final Rule will have a significant economic impact on a substantial number of small entities, including Plaintiffs and Plaintiff NFI's small business members.  If the Final Rule were to go into effect, Plaintiffs and NFI members will suffer significant and immediate economic loss in two ways.  First, the cost of data entry is significant and was significantly underestimated by the agency.  Originally, the agency suggested that the data entry costs would only be approximately $250,000.  Later, after the proposed rule was published, OMB increased the estimated cost of data entry to approximately $6.5 million.  In the Final Rule, Commerce increased that cost to $20 million in the first year and $18 million thereafter.  .

86.   OMB in its October 2016 issuance under the Paperwork Reduction Act estimated that
there are 215,000 import events each year; if one applies the SBA estimate of $20,000
per import event, just for data entry, the costs could be more than $1 billion annually,
depending on the distribution of container size, harvesting events per container, and
package size within each container.

87.   Neither OMB nor the agency even attempted to estimate the impact that the Rule would
have on costs to the importers, most of which are also domestic distributors.  By
increasing the labor intensity of seafood processing in order to trace fish to the fishing
vessel or collection point on a single day or harvesting event, the Rule would directly
increase the cost to the U.S. importers which would be passed on to consumers by as
much as $1 billion or more per annum.  The agency acknowledges that this category of
costs was not among the costs it assessed; the costs it assessed "included the precise
amount of permit fees and an acknowledgement of incremental costs of reporting and
recordkeeping."  81 Fed. Reg. at 88,984 (col. c).  No other costs were assessed.

88.   Seafood demand is highly elastic; a small increase in price will have significant adverse
effect on demand.  Thus, higher prices will lower demand, which will transform profits
into losses, thereby injuring the importers/distributors and restaurants, most of which are
small businesses within the meaning of the Small Business Act.  The record is devoid of
any discussion of the magnitude of this burden, other than the blithe recognition that the
rule would lead to an increase in consumer costs.

89.   The agency's final RFA Analysis, like the IRFAA, did not posit viable alternatives, as
required by the RFA.  This is surprising given that seafood fraud can be inexpensively
combatted at the port of entry either through  DNA testing or visual inspection.  IUU

fishing can also being easily assessed and combatted by GPS surveillance systems that are now in use. And, the agency did not discuss the most obvious alternative available to it – utilization of the Lacey Act and other existing laws against illegally harvested imports. The agency did not mention or discuss any of these rational and relatively inexpensive, but more effective, alternatives.

90.     As a result of the Final Rule and the agency's improper RFA Analysis, Plaintiffs will be immediately and irreparably injured. Implementation of the Rule should therefore be enjoined until such time as the agency has completed an RFA Analysis that comports with law.

**Count 6**
**Agency Failed to Conduct a Proper Cost Benefits Analysis As Required by the MSA**
**(5 U.S.C. § 706, 16 U.S.C. § 1855(e) (incorporating Executive Order 12866))**

91.     Plaintiffs incorporate by reference paragraphs 1-90.

92.     The MSA § § 305(e) (16 U.S.C. § 1855(e)) requires the Secretary, in issuing rules, to comply with the requirements of Executive Order 12866. That Executive Order requires the agency to assess "the potential costs and benefits of the regulatory action."

93.     Even though the agency acknowledges that the Final Rule is "significant for the purposes of Executive Order 12866," it nonetheless failed to conduct a cost-benefit assessment. 81 Fed. Reg. at 88,993 (col. b). The major costs that would be incurred if the Rule were to be implemented are those costs incurred by the processors to modify their processing to enable the collection of data necessary for the importer. Those additional costs, which could reach $1 billion annually, will be passed on to the importers, distributors, restaurants and groceries in the United States. Yet, none of these increased costs (other than data entry and fees) was assessed, as required. *Id.* at 88,984 (col. c).

94.     As a result, the agency violated MSA § 305(e) and as such the Rule must be set aside as "not in accordance with law."  5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray that the Court:

1.     Enter a preliminary injunction under the RFA and as may otherwise be permitted, enjoining the effective date of the rule until the agency completes an analysis of the type required by the RFA or otherwise;

2.     Enter a declaratory judgment that the Final Rule is invalid, a permanent injunction to prohibit Defendants from implementing it or otherwise giving effect to it, and vacate the Final Rule;

3.     Enter a declaratory judgment that Defendants failed to undertake the required analyses under the Regulatory Flexibility Act and MSA § 305(e) (incorporating requirements of Executive Order No. 12866)  and a permanent injunction to prohibit Defendants from implementing the Final Rule until such time as the Defendants their responsibility under the Regulatory Flexibility Act and Executive Order 12866 to the satisfaction of the Court, and retain jurisdiction of this case to ensure compliance with the Regulatory Flexibility Act.

4.     Award Plaintiffs their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise, and expert witness fees; and

5.      Award such further and additional relief as is just and proper.

Respectfully Submitted,

s/Robert P. Charrow

Robert P. Charrow (DC SBN 261958)
Laura Klaus (DC SBN 294272)
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Telephone:  (202) 533-2396
Facsimile:  (202) 261-0164
Email:  charrowr@gtlaw.com; klausl@gtlaw.com

Counsel for Plaintiffs