# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ALFA INTERNATIONAL SEAFOOD, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. 1:17-cv-00031 (APM) |
| WILBUR L. ROSS, JR., et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Defendant-Intervenor-Applicant Alaska Bering Sea Crabbers ("ABSC") is a trade association representing king crab harvesters operating in the Bering Sea and Aleutian Island crab fishery, located off the coast of Alaska. ABSC seeks to intervene in this case to defend against Plaintiffs' challenge to the Seafood Import Monitoring Program, 81 Fed. Reg. 88,975 (Dec. 9, 2016), known as the "Seafood Traceability Rule" ("the Rule"). *See* Mot. to Intervene, ECF No. 43 [hereinafter Mot. to Intervene]. Given the court's recent decision on another motion to intervene, *see* Mem. Op. & Order, ECF No. 44, it will not repeat relevant facts or legal standards pertinent to ABSC's motion and, instead, turns directly to the merits of ABSC's motion.

I.  STANDING

ASCB has standing to intervene. "Where . . . a plaintiff alleges that it will suffer future economic harm as the result of a government action, the complaint and declarations must together demonstrate a substantial probability of injury-in-fact, causation, and redressability." *See Carpenters Indus. Council v. Zinke*, No. 15-5304, 2017 WL 1323530, at *4 (D.C. Cir. April 11, 2017). ABSC relies on the declaration of Kale Garcia, the organization's president, to establish the "substantial probability" of injury. Garcia explains that ABSC members are granted federal

regulatory fishing privileges, known as "quota shares," "to harvest a portion of the annual total allowable catch of certain crab species, including red king crab" in the Bering Sea and Aleutian Island ("BSAI") fishery. Mot. to Intervene, Ex. 1, ECF No. 43-1 [hereinafter Garcia Decl.], ¶ 4. An ABSC member holding a quota share for red king crab, for instance, has the exclusive right either to catch and sell a certain percentage of the total red king crab population permitted to be harvested from the BSAI fishery under the governing regulations, or to lease its quota share to other qualified fishermen. *Id*. ¶ 4. Garcia further attests that "ABSC members who supply king crab are forced to compete against illegally caught Russian king crab, which floods the market, decreases prices, and reduces revenue that ABSC members can generate from their exclusive harvesting privileges in the BSAI king crab fishery." *Id*. ¶ 5. Garcia claims that the Rule's traceability requirements—requiring importers of red king crab to trace the catch either to its place of origin or the vessel that caught it—will benefit ABSC members, *id.* ¶ 8, and, on that basis, ABSC argues that it has standing to intervene. "If Plaintiffs succeed in vacating the [the Rule], the financial benefits to ABSC's members in excluding illegally caught Russian crab from the U.S. market will be lost, and ABSC's members will continue to face unfair competition and attendant economic losses from imports of illegally harvested crab." Mot. to Intervene at 7.

ABSC has demonstrated injuries that are both "concrete" and "particularized." *Spokeo, Inc. v. Robins*, 578 U.S. ___, ___, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted). ABSC members face substantial competition from the Illegal, Unregulated, and Unreported ("IUU") fishing of king crab by Russian fishermen. Garcia Decl. ¶ 5. Further, the vast majority of king crab consumed in the United States is imported from Russia and, according to a National Marine Fisheries Service report, a significant portion of imported king crab is the product of IUU

2

fishing in Russian waters. Garcia Decl., Ex. A, at 16.[1] The economic harm wrought by the sale of illegally harvested crab is well documented. One study concludes that: "Illegally caught king crab enters the [U.S.] market using the same labels and packaging as legally caught king crab, increasing the supply and decreasing the prices law-abiding fisherman earn." Garcia Decl., Ex. B, at 20. That same study shows that, in 2012, competition from IUU fishing in Russian waters contributed to a nearly 25 percent decrease in the prices paid for king crab to ABSC member fishermen. *Id.* at 24. The National Oceanic and Atmospheric Administration reached a similar conclusion, estimating that "illicit Russian crab has cost U.S. fishermen—many of them from Alaska—$560 million" from 2000 to 2012. Garcia Decl., Ex. C, at 28. These numbers plainly demonstrate that ABSC members suffer measurable economic harm from IUU fishing of king crab, which is clearly an injury-in-fact. *Carpenters Indus. Council*, 2017 WL 1323530, at * 4 (holding that "[e]conomic harm to a business clearly constitutes an injury-in-fact").

Satisfying the remaining two elements of Article III standing—causation and redressability—is slightly more complicated. Causation and redressability typically "overlap as two sides of a causation coin," *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997), and so the court's analysis of those two factors will also, necessarily, overlap. The causation analysis can be "imprecise" and "notoriously difficult." *Carpenters Indus. Council*, 2017 WL 1323530, at * 4. Nevertheless, "[c]ommon sense and basic economics" are "useful tool[s]" to assist courts in undertaking that analysis. *Id.* Applying those tools here, the court finds that ABSC satisfies the causation and redressability elements of standing because its members are substantially likely to suffer economic injury if Plaintiffs succeed in vacating the Rule. ABSC has

---

[1] Pin cites to the exhibits attached to the Garcia Declaration correspond to the page number generated by ECF.

offered unchallenged evidence that the sale of illegally harvested king crab from Russian waters constitutes such a sizeable portion of the total king crab sold in the United States that it depresses the market price of lawfully caught domestic king crab. The purpose of the Rule, among other things, is to detect illegally caught or fraudulently labeled fish before it enters the U.S. market and, relatedly, to deter the importing and distribution of such fish. Compl., ECF No. 1, ¶ 2. If the Rule achieves that dual purpose, then it will financially benefit U.S.-based king crab fishermen. As the comments accompanying the final Rule explain:

> [The Rule] will facilitate a determination of whether imported seafood has been lawfully acquired and not misrepresented and deter the infiltration of illegally harvested and misrepresented seafood into the supply chain. In addition to such deterrent effect, there may be price effects in that illegal or would-be fraudulent seafood would be diverted from the U.S. market to lower value markets. Taken together, deterrent and price effects would reduce the incentives for IUU fishing operations and for seafood fraud. Conversely, authorized fisheries stand to benefit from import monitoring programs that aim to identify and exclude products of IUU fishing and seafood fraud, both through enhanced market share and potentially higher prices.

Seafood Import Monitoring Program, 81 Fed. Reg. at 88,992. Thus, implementing the Rule's traceability requirements is substantially likely to financially benefit fishermen authorized to harvest king crab from the BSAI fishery, including ABSC members. The opposite is also true: If Plaintiffs succeed in thwarting the Rule, then ABSC members will not realize those financial benefits. That direct causal relationship between potentially vacating the Rule and the financial injury that such judicial action would inflict upon ABSC members satisfies the elements of causation and redressability. *See Carpenters Indus. Council*, 2017 WL 1323530, at * 4; *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (finding that proposed intervenor, the government of Mongolia, had standing to intervene because reversal of agency action "threatened

loss of tourist dollars, and the consequent reduction in funding for [its] conservation program" and "it is likely that a decision favorable to the [government of Mongolia] would prevent that loss from occurring").

In sum, ABSC has provided evidence that vacatur of the Rule is substantially likely to cause its members to suffer measurable economic harm, which the court could remedy by ruling against Plaintiffs' challenge and thereby permitting the Rule to be implemented. Accordingly, the court concludes ABSC has standing to intervene in this matter. *See Spokeo*, 136 S. Ct. at 1547.

Plaintiffs attack ABSC's standing on multiple fronts. First, they argue that ABSC's claimed injury is not sufficiently concrete because (1) the Garcia Declaration is largely devoted to ABSC members' ability to compete in international, as opposed to U.S., markets, which will not be affected by the Rule, and (2) ABSC's argument relies on outdated statistics that do not reflect a September 2015 bilateral agreement between the United States and Russia designed to combat IUU fishing. *See* Pls.' Opp'n to Mot. to Intervene, ECF No. 46 [hereinafter Pls.' Opp'n], at 4–5. Those arguments are unconvincing. The Garcia Declaration shows through historical data—not mere speculation or conjecture—that the sale of IUU-fished king crab has depressed crab prices in the United States. As a result, U.S.-based king crab fisherman have lost tens of millions of dollars over the years. And, while the benefits of the recent U.S.-Russia accord are not yet fully known, the agreement will not completely eliminate the sale of illegally-fished king crab in the U.S. market or fully ameliorate the negative price effects of such sales. Plaintiffs do not contend otherwise. To establish concrete injury, ABSC need only show a "substantial probability" that its members will incur even a minor degree of economic harm: "A dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenter Indus. Council*, 2017 WL 1323530, at * 4. The Garcia Declaration satisfies that low bar.

Plaintiffs also claim that the court's prior decision in this case, which denied intervention to a group of environmental organizations, precludes a finding that ABSC has established a concrete injury. Specifically, Plaintiffs characterize the court's prior opinion as holding that "the desire to reduce the impact of IUU fishing . . . 'is simply too abstract to satisfy the 'concrete' injury requirement'" of Article III. Pls.' Opp'n at 3–4 (quoting Mem. Op. & Order, ECF No. 44, at 2). Plaintiffs, however, take the above-quoted portion out of context and, in so doing, mischaracterize the court's prior decision. The court's actual statement reads: "The inexact prospect of reducing exposure to the actual harm *Applicants' declarants* wish to avoid is simply too abstract to satisfy Article III standing." Mem. Op. & Order, ECF No. 44, at 2–3 (emphasis added). The court's statement, properly construed, did not categorically declare that the desire to reduce the negative impacts of IUU fishing could never qualify as a concrete and particularized injury. Rather, the court only held that the declarations provided by the intervenor-applicants were insufficient.[2] Thus, Plaintiffs' attempt to graft the court's prior fact-specific holding onto ABSC's intervention application is misguided.

Next, Plaintiffs assert that ABSC fails to meet the stricter standard of causation demanded in cases, like here, where the injury asserted is directly caused by a third party, i.e., Russian fisherman who catch and sell IUU king crab in U.S. markets. Pls.' Opp'n at 4. Plaintiffs correctly point out that, where claimed injuries are directly caused by third-party conduct, the D.C. Circuit requires "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Id.* (quoting

---

[2] The court can conceive of facts that, if available, would have strengthened the environmental groups' showing of injury-in-fact. For instance, the Steiner Declaration may have established standing if it had shown that IUU fishing has depleted the fish populations subject to the Rule that Steiner sought to study or observe around Cocos Island and that such illegally caught fish have entered the U.S. market. *See* Oceana Mot. to Intervene, ECF No. 24, Ex. 6, ECF No. 24-6. The Steiner Declaration, however, was silent as to such important facts.

*Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015)). The causal relationship at issue here—between the Rule and illegal fishing by third parties—does not give rise to doubt. ABSC has put forward substantial evidence that the illegal catch and sale of king crab denies law-abiding ABSC fishermen the economic benefits of a fair and competitive marketplace. The Rule seeks to identify and deter that very conduct. Thus, ABSC has satisfied the stricter standard of causation required where harm is premised on third-party conduct.

Finally, Plaintiffs contend that the doctrine of competitor standing applies in this case and that ABSC has failed to meet the standard for establishing an injury-in-fact under that doctrine. Pls.' Opp'n at 5. The basic premise of the competitor standing doctrine is that "economic actors suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (alteration in original) (internal quotation marks omitted). To demonstrate injury in such cases, "the complainant [must] show an actual or imminent increase in competition" and, if they do, courts "will almost certainly [find] an injury in fact." *Id.* at 73. Plaintiffs assert that ABSC cannot meet that standard because a decision to vacate the Rule would not authorize illegal activity; IUU fishing is illegal with or without the Rule in place. Pls.' Opp'n at 5. Plaintiffs' reliance on the competitor standing doctrine is misplaced. The Rule does not lift regulatory restrictions on ABSC's competitors or increase competition in any other way. Rather, the Rule's clear purpose is to identify and deter illegal conduct, not to authorize it, and its intended effect is to *decrease* competition from IUU fishermen in the market for king crab. Accordingly, the competitor standing doctrine does not apply here, and the court concludes that ABSC has Article III standing to intervene.

## II. RULE 24'S REQUIREMENTS

The court also finds that ABSC has satisfied the requirements to intervene as a matter of right under Federal Rule of Civil Procedure 24. The parties primarily dispute whether the Federal Defendants will adequately represent ABSC's interests in this matter such that intervention is appropriate.[3]

The court finds that ABSC has satisfied the "minimal" showing that the Federal Defendants may not adequately represent its interests in this matter. *See Fund for Animals, Inc.*, 322 F.3d at 735 ("The Supreme Court has held that this 'requirement of . . . Rule [24(a)(2)] is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal.'" (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).[4] As an initial matter, ABSC's and the Federal Defendants' mutual interest in having the court affirm the Rule does not preclude intervention as a matter of right, and the D.C. Circuit has "look[ed] skeptically on government entities serving as adequate advocates for private parties." *See Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 321 (D.C. Cir. 2015). That is particularly true when the private-party intervenor asserts a "financial stake in the outcome" of the suit. *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *see also Fund for Animals*, 332 F.3d at 736. That is precisely the divergent interest that ABSC asserts here: "ABSC members have economic interests and hold regulatory entitlements that are directly affected by the [R]ule, and thus have a financial stake" in the continued viability of the Rule that "[t]he government does not share." Reply in Supp. of Mot. to

---

[3] Plaintiffs also argue that ABSC's motion should be denied because it is "untimely and purposefully disruptive." Pls.' Opp'n at 9. The court disagrees. ABSC has agreed to abide by the briefing schedule in this case, *see* Mot. to Intervene at 10, and the court does not otherwise find the timing of ABSC's Motion to be "purposefully disruptive."
[4] For a second time, Plaintiffs have wrongly argued that the standard for demonstrating inadequacy of representation is stricter when the government is the defendant. *See* Pls.' Opp'n at 7.

Intervene, ECF No. 47, at 7–9. That interest is not simply a "narrower" interest, *contra* Pls.' Opp'n at 8, but rather, one that is clearly defined and materially different from the Federal Defendants' interests. *Cf.* Mem. Op. at 7–8 (rejecting intervenor-defendants' claimed interests as differing from that of the government because their interests, although narrower, were not "clearly defined"). As a result, the court agrees that the Federal Defendants "may not" adequately represent ABSC's divergent economic interests in defending the Rule. *See Crossroads*, 788 F.3d at 321; *Fund for Animals*, 322 F.3d at 736–37. The court therefore concludes that ABSC has satisfied the requirements to intervene as a matter of right under Rule 24.

For the reasons stated above, the court grants Defendant-Intervenor-Applicant Alaska Bering Sea Crabbers' Motion to Intervene. ABSC is permitted to intervene in this matter as a defendant and is subject to the deadlines set forth in the summary judgment briefing schedule issued on March 10, 2017. *See* Order, ECF No. 31.

Dated: May 8, 2017

Amit P. Mehta
United States District Judge