_____
                              )

**ALFA INTERNATIONAL SEAFOOD, et al.,**  )
                              )

    **Plaintiffs,**                     )
                              )

        **v.**                       )    **Case No. 1:17-cv-00031 (APM)**
                              )

**WILBUR L. ROSS, JR., et al.,**        )
                              )

    **Defendants.**                  )
_____ )

## MEMORANDUM OPINION

    "One fish two fish red fish blue fish.  Black fish blue fish old fish new fish. . . .
Say! what a lot of fish there are."

        –  Dr. Seuss, *One Fish Two Fish Red Fish Blue Fish* (1960)

## I.    INTRODUCTION

    It turns out that there are a lot more fish in the sea than even Dr. Seuss imagined.  So many, in fact, that countries, including the United States, historically have had difficulty keeping track of the seafood that crosses their borders.  This is increasingly problematic, as the United States consumes billions of pounds of seafood every year and, as many U.S. consumers may be surprised to learn, more than 90% of that seafood is imported.  Thus, the vast majority of seafood consumed each year in the United States either originates from waters far from home or is caught locally but passes through a foreign processing and distribution chain.  Take, for example, a catch of king crab harvested off the coast of Alaska.  That crab may be sent from Alaska to South Korea or China for processing and packaging.  The packaged crab meat, in turn, is exported from Asia across the Pacific to the United States, to be combined with other ingredients into a crab cake, eaten by someone with little appreciation for the peripatetic journey that produced her meal.  This

multistage, multinational process means that the worldwide marketplace for seafood is big business. The United States alone imports more than $10 billion in seafood every year.

The complexity of this catch-to-table distribution chain, however, is rife with vulnerabilities. It is well documented that, at each stage, opportunists seek to game the system, largely by circumventing laws or norms that regulate the manner in which the world seafood market operates. Such activities—known as "illegal, unreported, and unregulated" ("IUU") fishing and "seafood fraud"—have had profound global and domestic economic and noneconomic consequences.

This case is about a U.S. federal government regulation, known as the "Seafood Import Monitoring Program" (the "Rule"), which aims to address the problem of IUU fishing and seafood fraud. Promulgated by the Department of Commerce (the "Department") through its sub-agency, the National Marine Fisheries Service, the Rule's purpose is to protect U.S.-based fisheries and fishermen from unfair competition, as well as increase global food security and promote the sustainability of marine resources. Starting on January 1, 2018, the Rule will require U.S.-based importers of seafood to collect information about each stage of the supply chain for certain types of seafood imported into the United States, starting from the catch's point of origin until its arrival to our shores. Importers also will have to identify the seafood species entering the United States, as well as obtain a permit from the Department to continue importing seafood into the United States. The agency anticipates that these requirements will increase the expense of importing seafood and, ultimately, may increase the cost of seafood to the consumer.

This case presents a challenge to the Rule. Plaintiffs include several U.S.-based seafood importers, processors, and harvesters who claim that the Department violated federal law in promulgating the Rule and that businesses will be harmed as a result. In broad strokes, Plaintiffs

posit that the Department acted without proper authority, under both the relevant statutes and the Constitution, by issuing an overly expansive and highly burdensome regulatory regime and relying on insufficient evidence to do so. Specifically, Plaintiffs maintain that (1) the Rule was not issued by someone with either the statutory or constitutional authority to do so; (2) the Department acted outside its authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), Pub. L. No. 94-265 (codified as amended at 16 U.S.C. §§ 1801–1891),[1] in issuing regulations aimed at seafood fraud; (3) the Rule was promulgated in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., because it is based on undisclosed or insufficient supporting information; and (4) the Department failed to properly complete a Regulatory Flexibility Analysis concerning the Rule's effect on small businesses, as required under the Regulatory Flexibility Act, 5 U.S.C. §§ 601–611. Plaintiffs urge the court to invalidate the Rule.

Before the court are the parties' cross-motions for summary judgment. Having given careful consideration to the parties' arguments and closely reviewed the extensive administrative record, the court finds that (1) the Rule's issuance did not run afoul of the MSA, and the current Secretary of Commerce validly ratified the Rule, thereby curing any alleged constitutional defect in the Rule's promulgation; (2) Congress granted the Department authority to issue regulations to combat seafood fraud, and the Department did not encroach upon another agency's exclusive jurisdiction by so doing; (3) the Rule does not violate either the procedural or substantive requirements of the APA; and (4) the Department did not transgress the requirements of the Regulatory Flexibility Act. Accordingly, the court denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Cross-Motions for Summary Judgment.

---

[1] For ease of reference, the court will refer exclusively to the Act's corresponding sections in the U.S. Code throughout this Memorandum Opinion.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Illegal, Unreported, and Unregulated Fishing and Seafood Fraud*

"Illegal, unreported and unregulated" ("IUU") fishing encompasses a broad range of illicit conduct.  It includes (1) fishing in violation of national, regional, or international laws and regulations ("illegal"); (2) failing to report or misreporting fishing activities to proper authorities when required ("unreported"); and (3) fishing in areas or for fish stocks for which management measures are lacking ("unregulated").  *See* Admin. Rec., ECF Nos. 71–74, 77, 79 [hereinafter A.R.], at 013102.[2]

IUU fishing has had tremendous economic, environmental, and health impacts.  IUU-caught fish have flooded markets worldwide and eroded the profits of legitimate fishermen by undercutting their prices.  *Id.* at 000001.  One study, for instance, estimates that IUU fishing causes annual worldwide economic losses between $10 billion and $23.5 billion.  *Id.* at 000357.  Another study found that between 20% and 32% of wild-caught seafood imported into the United States originates from IUU fishing, with an estimated value between $1.3 billion and $2.1 billion.  *Id.* at 000360.  IUU fishing also has environmental impacts.  Illegal fishing often violates internationally established conservation and management measures, which in turn has adverse impacts on fisheries, marine ecosystems, and coastal communities worldwide.  *Id.* at 013102–03.  Finally, IUU fishing operations are unlikely to observe seafood health regulations, thereby passing health risks along to consumers.  *Id.* at 013103.  The scourge of IUU fishing is thus a problem of global concern.

---

[2] The administrative record appears in multiple places on the docket, but with continuous pagination across the different entries.  For ease of reference, the court cites to the record as though presented as a single document.

A related problem to IUU fishing is "seafood fraud." Generally speaking, seafood fraud is the practice of misleading consumers about the type or origin of seafood. *Id.* The most prominent seafood fraud practices are "species substitution"—i.e., falsely representing the type of fish being sold—and mislabeling—i.e., misrepresenting the seafood's country of origin. *Id.* As a result of such behavior, for instance, consumers who purchase "wild-caught" salmon may actually be getting farm-raised salmon. Worse yet, a consumer who bites into a tuna sandwich may not be eating tuna at all, but instead, escolar, which is a less expensive species of fish potentially harmful to human health. *Id.* at 002459. Thus, seafood fraud not only denies the consumer the right to know what she is eating, but also can present latent health risks.

2.     *The IUU Task Force*

To address these concerns, on June 17, 2014, President Obama established by Executive Order a "Presidential Task Force on Combating Illegal, Unreported, and Unregulated Fishing and Seafood Fraud" (the "IUU Task Force" or "the Task Force"). *See id.* at 000001–04. The President established the IUU Task Force as a subcommittee reporting to the National Ocean Council and designated as its co-chairs the Secretaries of Commerce and State, or their designees. Representatives from 12 other federal agencies served as Task Force members. The President charged the Task Force with developing a comprehensive scheme to "combat IUU fishing and seafood fraud" by "implement[ing] existing programs, and, if appropriate, develop[ing] . . . new, voluntary or other, programs for seafood tracking and traceability." *Id.* at 000002. The President directed the Task Force to make, within 180 days, "recommendations for the implementation of a comprehensive framework of integrated programs to combat IUU fishing and seafood fraud that emphasizes areas of greatest need." *Id.*

The Task Force commenced its work immediately. It initiated a public process to solicit information and advice on recommendations to combat IUU fishing and seafood fraud. *Id*. at 013107. That process included inviting public comment through a notice in the Federal Register, holding public meetings, and hosting webinars. *Id*. The Task Force also analyzed the federal government's existing enforcement authority with respect to IUU fishing and seafood fraud, including gaps in such authority, and examined areas for improved coordination among federal agencies. *Id*.

Six months later, in December 2014, the Task Force made 15 recommendations to the President for "the implementation of a comprehensive framework of integrated programs to combat IUU fishing and seafood fraud that emphasizes areas of greatest need." *Id*. at 002665–69. Among the Task Force's key recommendations was the creation of a seafood "traceability" program, under which seafood importers would be required to submit information documenting each link in the supply chain of the seafood they import, the first phase of which would apply to species with either a well-documented history of seafood fraud or a significant risk profile for IUU fishing. *Id*. at 002668–69. The Task Force determined that increasing transparency in the supply chain would enable authorities to more effectively prevent illegally caught or misrepresented seafood from entering the supply chain and the U.S. market. This increased scrutiny, in turn, would reduce the incentives to engage in IUU fishing over time. Additionally, by reducing the amount of illegally caught seafood in the U.S. market, domestic fishermen would be able to compete on a level playing field and reap the attendant financial benefits. And, of course, reducing IUU fishing also would have positive environmental benefits, such as protecting overfished species and safeguarding sensitive marine ecosystems. *Id*. at 002670–73, 014046.

After seeking public comment, the IUU Task Force published an Action Plan to implement its 15 recommendations.  *Id*. at 002666, 004465, 013102–40.  The Action Plan identified the types of data that would need to be collected and set forth an implementation timeline, including for the traceability program, whereby certain "at risk," or "priority," species would be subject to the Rule's information collection requirements before other species.  *Id*. at 006908, 013135–37.  The Action Plan anticipated that, following a period of notice and comment, the final Rule would issue by August 2016 and become effective by September 2016.  *Id*. at 013136.

3.      *The Department's Notice-and-Comment Rulemaking*

Following publication of the Action Plan, the Task Force's efforts continued under the direction of the National Ocean Council Committee on IUU Fishing and Seafood Fraud.  *Id*. at 004465.  That Committee, in turn, commissioned a Working Group, led by the National Oceanic and Atmospheric Administration and comprised of representatives from the Departments of State and Homeland Security, the Food and Drug Administration, Customs and Border Protection, and the Office of the U.S. Trade Representative (collectively, the "Working Group"), to design and implement regulations to effectuate the Task Force's Action Plan.  *Id*.  The Working Group acted under the auspices of the National Marine Fisheries Service, a sub-agency within the Department of Commerce.  For ease of reference, the court will refer to the various agencies, sub-agencies, and committees that worked on the Rule simply as the "Department," except where greater specificity is needed for the court's analysis.

Before issuing the Final Rule, the Department published multiple notices in the Federal Register.  *Id*.  First, in April 2015, the Department published a Notice calling for public comment on the principles it ought to use in developing the list of "priority" species to which the Rule would first apply.  *Id*. at 002674–75.  In July 2015, the Department published a second Notice soliciting

public comment on the type of information and documentation the traceability program should collect. *Id*. at 003129. In August 2015, after receiving a substantial number of public comments in response to its earlier notices, the Department published a third Notice that contained seven principles for identifying "priority" species,[3] provided an initial draft of the priority species list, and described the agency's methodology for developing both lists. *Id*. at 003971–78. The August Notice also stated that the final traceability program and priority species list would be developed pursuant to the agency's rulemaking authority under the Magnuson-Stevens Fishery Conservation and Management Act. *Id*. at 003971.

In October 2015, the Department published a final Notice of Determination. That Notice identified the final list of principles that the agency used to identify priority species, as well as the priority species that would be subject to the Rule.[4] *Id*. at 004464–68. As to each selected species, the Notice included a "[b]rief summar[y]" of the Working Group's "findings" that explained the rationale for the species' designation. Those summaries did not, however, disclose the data that the Department had collected concerning incidents of IUU fishing and seafood fraud, or any related enforcement activities. The final Notice of Determination explained that a "[d]etailed presentation of the data considered by the [Department] and its deliberations is protected from disclosure because of data confidentiality and enforcement implications." *Id*. at 004467; *see also id.* at 004469 (explaining that the "details of the results have not been included because much of the data

---

[3] Those principles are as follows: (1) enforcement capability; (2) existence of a catch documentation scheme; (3) complexity of the chain of custody and processing; (4) history of species substitution; (5) history of mislabeling; (6) history of fisheries violations; and (7) history of human health risks associated with the substitution or mislabeling of the particular species. *See* A.R. at 003971.

[4] The proposed list of "priority" species included: (1) abalone; (2) Atlantic cod; (3) blue crab; (4) dolphinfish (mahi mahi); (5) grouper; (6) king crab (red); (7) Pacific cod; (8) red snapper; (9) sea cucumber; (10) sharks; (11) shrimp; (12) swordfish; and (13) tunas (albacore, bigeye, skipjack, and yellowfin). A.R. at 004467–68. Based on public comment in response to earlier notices, the Department determined that species of bluefin tuna are subject to lesser risk of IUU fishing and seafood fraud and, thus, removed bluefin tuna from the priority species list announced in the October 2015 Notice. *Id.*

reviewed are sensitive and/or confidential, and could compromise the integrity of individual businesses, systems or enforcement capability if released"). *Id.* The Department did not further elaborate on the agency's justification for non-disclosure.

4.      *The Proposed Rule*

In February 2016, the Department published the Proposed Rule in the Federal Register, pursuant to its authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). *Id.* at 004477–88. The agency explained that the Proposed Rule "implements MSA section 307(1)(Q), which makes it unlawful to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish taken, possessed, transported, or sold in violation of any foreign law or regulation or any treaty or binding conservation measure to which the United States is a party." *Id.* at 004478 (referencing 16 U.S.C. § 1857(1)(Q)). The Department thus identified 16 U.S.C. § 1857(1)(Q) as the source of its authority to regulate IUU fishing and seafood fraud.

The Proposed Rule set forth the data-collection requirements of the traceability program and the species that initially would be subject to those requirements. As a condition of importing both wild-caught and farm-raised seafood into the United States, the Proposed Rule required domestic importers of seafood to obtain a permit from the Department, collect and electronically report supply-chain data to the federal government, and maintain certain types of records for five years. *Id.* at 004477–79, 004484. The Proposed Rule made clear that importing any priority species without a valid permit or submitting inaccurate or incomplete traceability data would constitute a violation of the MSA. *Id.* at 004479, 004484–86, 004489. It also subjected importers to periodic, at-will audits. *Id.* at 004484, 004489. The Proposed Rule also identified the priority species to which the traceability requirements would apply. *See id.* at 004480.

In conjunction with publishing the Proposed Rule, the Department prepared both a draft Regulatory Impact Review, in compliance with Executive Order 12866, and an initial Regulatory Flexibility Analysis, as required under the Regulatory Flexibility Act, 5 U.S.C. § 604. *Id*. at 004486–87, 004498–520. The purpose of those analyses was to determine the economic impact of the Proposed Rule on U.S. consumers and businesses, including small entities. The Department estimated that the "industry-wide increase in annual costs to importers" would be $60,000 in permit fees, plus "incremental costs" of systems development. *Id*. at 004487. That conclusion was premised on the key assumption that, "to some extent," seafood suppliers already were collecting the data required by the Proposed Rule in order to comply with existing traceability programs, such as the European Union's Catch Documentation Program, whose data-collection requirements are similar to those of the Proposed Rule, or voluntary third-party verification schemes. *Id*. For instance, the agency reasoned that, because most foreign seafood suppliers that export to the United States had already incurred costs associated with the E.U. traceability program's data-collection requirements, the Proposed Rule's similar requirements would impose only "incremental" costs on those suppliers. Those incremental costs, the agency posited, might be passed onto U.S.-based importers, but would not materially increase their operational costs. *Id*. at 004487, 004502, 004504–05. The Department ultimately concluded that U.S. entities "would not be significantly affected by this action" and that there would be no "significant adverse or long-term economic impacts" on U.S. small businesses. *Id*. at 004486–87.

Also, as required by the Regulatory Flexibility Act, the Department evaluated "several alternatives" to the traceability program, including a "no-action alternative" and "various combinations of data reporting and recordkeeping." *Id*. at 004487. The agency concluded,

however, that the Proposed Rule better carried out IUU Task Force's seafood traceability recommendations and thus rejected the considered alternatives. *Id*.

### 5.    *The Final Rule*

After a public comment period on the Proposed Rule, the Department published the Final Rule on December 9, 2016. *Id*. at 006907–28. The Final Rule became effective as of January 9, 2017, but does not require importers to begin to collect and report traceability data for priority species until January 1, 2018. *Id*. at 006907. The agency explained that it set the Rule's compliance date one year after its effective date in order to afford importers sufficient time to work with their suppliers to facilitate the requisite data collection and transfer. *Id*. at 006914–15.

In response to public comments, the Final Rule altered the Proposed Rule in several key respects. The Final Rule: (1) exempts importers from providing vessel information for small-scale fishing vessels, in an effort to ease the regulatory burden associated with tracking such information; (2) reduces from five years to two years the amount of time importers will be required to maintain supply-chain records; (3) eliminates several categories of required records to reduce redundancy; and (4) stays indefinitely the Rule's application to shrimp and abalone. *Id*. at 006920–21.

Also, in response to public comments, the Department dramatically revised upward the cost estimates of its Regulatory Impact Review and Regulatory Flexibility Analysis. The agency's new estimate of industry-wide compliance costs increased from $60,000 to $7,850,000 in the first year and $6,075,000 annually thereafter, with a possible "upper-bound" cost estimate of $20,315,225 in the first year and $18,515,225 for each year following. *Id*. at 006926. The agency attributed this significant cost increase to the fact that it had modified the "assumptions" and "methodology" used to calculate its cost estimates to reflect suggestions provided by Plaintiff

National Fisheries Institute during the notice-and-comment period. *Id*. at 006925–26. Notwithstanding the significant increase in anticipated compliance costs, the agency did not deem those costs to be excessive. It reasoned that the industry-wide cost of compliance, even as revised, remained only a fraction (less than one half of one percent) of the $9 billion value of U.S. seafood imports. *Id*. Consistent with that rationale, the agency also found that the Rule's recordkeeping requirements would not "pose significant adverse or long-term economic impacts on small entities." *Id*.

##### B. Procedural Background

Plaintiffs in this action are U.S.-based harvesters, importers, processors, and purchasers of seafood, as well as a trade group representing such entities, whose businesses will be affected by the Rule. They filed suit on January 6, 2017, challenging the legality of the Rule under the Administrative Procedure Act and the Regulatory Flexibility Act and seeking an order vacating and permanently enjoining the Rule's implementation. *See* Compl., ECF No. 1 [hereinafter Compl.]. In light of the Rule's impending compliance date, and as required under the MSA, the court granted Plaintiffs' Motion for Expedited Treatment of the case. *See* Pls.' Mot. for Expedited Treatment, ECF No. 6; January 23, 2017, Minute Order.

Before the start of summary judgment briefing, the court received two motions to intervene, filed by entities seeking to defend the Rule. *See* Oceana, Inc., Nat. Res. Def. Council, Inc., Ctr. for Biological Diversity's Mot. to Intervene, ECF No. 24; Alaska Bering Sea Crabbers' Mot. to Intervene, ECF No. 43. The court granted one of those motions, permitting Intervenor-Defendant Alaska Bering Sea Crabbers to participate as a defendant in the litigation. *See* Mem. Op. & Order, ECF No. 50; *see also* Mem. Op. & Order, ECF No. 44.

The matter before the court is now fully briefed by the original parties and the Intervenor-Defendant. Plaintiffs filed their Motion for Summary Judgment on April 25, 2017. Pls.' Mot. for Summ. J., ECF No. 48. Federal Defendants and the Intervenor-Defendant followed with their separate Oppositions and Cross-Motions for Summary Judgment on May 9, 2017. *See* Fed. Defs.' Cross-Mot. for Summ. J., ECF No. 56; Intervenor-Def. Alaska Bering Sea Crabbers' Cross-Mot. for Summ. J., ECF No. 57 [hereinafter ABSC Mot.]. The court heard argument on the parties' motions on June 7, 2017, and now turns to resolving their competing contentions.

## III. LEGAL STANDARD

Ordinarily, cross-motions for summary judgment are reviewed under the standard set forth in Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, a court may grant summary judgment when a party demonstrates that there is no genuine issue of material fact and shows it is entitled to judgment as a matter of law. FED. R. CIV. P. 56. However, in cases such as this one that involve review of agency action under the Administrative Procedure Act, the Rule 56 standard does not apply. *See Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). Instead, "the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). In this posture, the court must decide "whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *See Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

## IV. DISCUSSION

Plaintiffs seek to invalidate the Seafood Import Monitoring Program (the "Rule") on several grounds. First, Plaintiffs contend that the Rule was promulgated in violation of the Secretary of Commerce's (the "Secretary") rulemaking authority under the Magnuson-Stevens

Fishery Conservation and Management Act ("MSA") and the Appointments Clause of the United States Constitution. *See* Pls.' Mot. for Summ. J., ECF No. 48, Mem. in Supp., ECF No. 48-1 [hereinafter Pls.' Mot.], at 17–22. Second, Plaintiffs argue that Congress did not authorize the Department of Commerce (the "Department") to regulate seafood fraud and, thus, the Department lacks the necessary statutory authority to issue the Rule. *Id*. at 13–17. Third, Plaintiffs assert that, even if the Department had the requisite rulemaking authority, the Rule is arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), because it was (1) formulated through the use of undisclosed data, and (2) based on insufficient, or contradictory, evidence. *Id*. at 22–33. Finally, Plaintiffs challenge the adequacy of the Department's Regulatory Flexibility Analysis, which they charge fails to address both the increased costs associated with the Rule and the availability of less burdensome regulatory alternatives to combat IUU fishing. *Id*. at 34–37. The court addresses each claim in turn.

### A. Was the Rule Properly Promulgated?

The court begins with Plaintiffs' contention that the Department promulgated, or issued, the Rule in violation of both the MSA and the Appointments Clause of the Constitution. *Id*. at 17–22. That argument has three sub-parts. First, Plaintiffs contend that, although Congress properly delegated rulemaking authority to the Secretary of Commerce under the MSA, Congress did not grant the Secretary the power to sub-delegate that rulemaking authority to another agency official and, even if it did, the sub-delegation here was improper under the agency's organizational policy. Second, Plaintiffs assert that any delegation of rulemaking authority was improper because the administrative record contains no notice of that delegation. Third, Plaintiffs maintain that the Rule was promulgated by a Department employee who did not have power under the Appointments

Clause of the Constitution to engage in rulemaking. Under any of these theories, Plaintiffs contend, the Rule must be vacated.

## 1. *Relevant Background Facts*

Before addressing the merits of Plaintiffs' arguments, the court sets forth the relevant background facts, some of which are in dispute. At the time the Rule was developed and promulgated, the Secretary of Commerce was Penny Pritzker. *See* Fed. Defs.' Answer, ECF No. 21 [hereinafter Fed. Defs.' Answer], ¶ 15. Per a Department of Commerce "Organizational Order," dated December 12, 2012, Secretary Pritzker delegated all rulemaking authority vested in her under the MSA to the Under Secretary of Commerce for Oceans and Atmosphere/Administrator of the National Oceanic and Atmospheric Administration (the "Administrator of NOAA"), who at the time was Kathryn Sullivan.[5] *Id.* ¶ 16. During the period Sullivan served as the Administrator of NOAA—NOAA is a sub-agency of the Department— Eileen Sobeck served as the Assistant Administrator for Fisheries, which is the top official at the National Marine Fisheries Service ("NMFS"), a "line office" within NOAA. Samuel D. Rauch III served as the Deputy Assistant Administrator for Regulatory Programs of NMFS. *Id.* ¶¶ 17–18.

Plaintiffs and Federal Defendants agree that neither Pritzker nor Sullivan promulgated the Final Rule. They disagree, however, as to who did. Federal Defendants assert that Sobeck "exercised lawfully delegated power to issue the Final Rule as the Secretary's designee." Fed. Defs.' Cross-Mot. for Summ. J., ECF No. 56, Mem. in Supp., ECF No. 56-1 [hereinafter Fed. Defs.' Mot.], at 43. In support, Federal Defendants point to an internal policy document, the

---

[5] *See* U.S. DEP'T OF COMMERCE, Under Secretary of Commerce for Oceans and Atmosphere and Administrator of the National Oceanic and Atmospheric Administration, DOO 10–15, at Section 3.01(aa) (last updated April 30, 2012), Office of Privacy and Open Government, http://www.osec.doc.gov/opog/dmp/doos/doo10_15.html (designating "[t]he functions prescribed in the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq." to the Under Secretary of Commerce for Oceans and Atmosphere and Administrator of NOAA).

"NOAA Organizational Handbook Transmittal No. 61," dated February 24, 2015, wherein the Administrator of NOAA (Sullivan) further sub-delegated the rulemaking authority under the MSA that she received from Pritzker to the Assistant Administrator for Fisheries (Sobeck).[6] Plaintiffs, on the other hand, contend that Sobeck did not issue the Final Rule. They insist that her subordinate, Rauch, promulgated the Rule based largely on the undisputed fact that Rauch, not Sobeck, signed the Final Rule, as published in the Federal Register on December 9, 2016. Pls.' Mot. at 8; Pls.' Combined Br. in Resp. to Cross-Mots. for Summ. J., ECF No. 62 [hereinafter Pls.' Reply], at 5–6; Fed. Defs.' Mot. at 41. Federal Defendants respond that Rauch's signature does not mean he in fact "issued" the Rule; rather, they assert that the same Handbook Transmittal that granted Sobeck power to issue the Rule delegated authority to Rauch to complete the ministerial task of signing the Final Rule. In other words, Federal Defendants argue that Rauch's signing of the Final Rule does not "constitute an exercise of rulemaking" and, thus, does not undermine their position that Sobeck issued the Rule.[7] Fed. Defs.' Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 65 [hereinafter Fed. Defs.' Reply], at 21, 24.

This dispute over who promulgated, or issued, the Rule lies at the heart of Plaintiffs' contention that the Department's rulemaking violated both the MSA and the Appointments Clause. With this background in mind, the court now turns to those arguments.

---

[6] *See* U.S. DEP'T OF COMMERCE, *NOAA Organizational Handbook Transmittal No. 61*, at Part II(C)(26) (Feb. 24, 2015), http://www.corporateservices.noaa.gov/ames/delegations_of_authority/transmittal-61.pdf.

[7] In their Complaint, Plaintiffs allege that Rauch both "signed and issued the Rule." Compl. ¶ 18. In their Answer, Federal Defendants admitted that Rauch "signed the Final Rule in his official capacity," but did not specifically deny the allegation that Rauch "issued" the Rule. Fed. Defs.' Answer ¶ 18. Shortly after filing their Answer, Federal Defendants moved to amend their Answer to clarify that they "deny that Mr. Rauch issued the Final Rule." Fed. Defs.' Mot. for Leave to Am. Answer, ECF No. 64 [hereinafter Fed. Defs.' Mot. to Am.], at 3–4; Fed. Defs.' Mot. to Am., Ex. 1, Am. Answer, ECF No. 64-1, ¶ 18. The court grants Federal Defendants' Motion for Leave to Amend to make this correction. Federal Defendants' omission was inadvertent, they moved promptly to correct their error, and Plaintiffs have not demonstrated that permitting the amendment would result in prejudice. *See* FED. R. CIV. P. 15(a)(2); *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1136–37 (D.C. Cir. 1989).

## 2.  Does the MSA Authorize the Sub-Delegation of Rulemaking Authority?

Plaintiffs first challenge the Secretary's authority to sub-delegate her rulemaking authority to subordinate agency officials.  Under the MSA, Congress vested in "[t]he Secretary" the "general responsibility to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter."  16 U.S.C. § 1855(d).  It also authorized "[t]he Secretary" to "promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter."  *Id.*[8]  Notably, the MSA defines the term "Secretary" for purposes of the Act to mean "the Secretary of Commerce *or his designee*."  *Id.* § 1802(39) (emphasis added).  Plaintiffs read these two statutory provisions in combination to permit the Secretary of Commerce to delegate her rulemaking authority under the MSA to a "designee," but to prohibit that designee from, in turn, delegating rulemaking authority further down the chain of command.  Pls.' Mot. at 18–19.  The statute does not, Plaintiffs maintain, "authorize successive delegations of the sort that would have had to have occurred here."  *Id.* at 18.

That argument is easily cast aside.  The D.C. Circuit has held that where, as here, "a statute delegates authority to a federal officer or agency, sub-delegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent."  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004).  Here, the MSA plainly delegates rulemaking authority to the Secretary of Commerce "or *his designee*," 16 U.S.C. § 1855(d) (emphasis added).  Consequently, at the time in question, the statute granted rulemaking

---

[8] Additionally, in November 2015, Congress passed the Illegal, Unreported, and Unregulated Fishing Enforcement Act of 2015, which, in part, implemented an international compact addressing IUU fishing, known as the Agreement on Port State Measures to Prevent, Deter and Eliminate Illegal, Unreported and Unregulated Fishing.  *See* Pub. L. No. 114-81, § 302, 129 Stat. 649, 664 (2015) (codified at 16 U.S.C. § 7401).  As will be discussed below, that congressional action strengthened the Secretary's hand to combat IUU fishing.  It also granted the Secretary "or his or her designee" the power to promulgate regulations to implement the Port State Measures Agreement.  *See id.*, § 304(a), 129 Stat. at 665 (codified at 16 U.S.C. § 7403(a)).

authority to *either* Pritzker *or* Pritzker's designee—Sullivan, the Assistant Administrator of NOAA—which means that, under *U.S. Telecom Association*, absent evidence of contrary congressional intent, *either* Pritzker *or* Sullivan presumptively could sub-delegate her rulemaking power to a subordinate. Plaintiffs point to no evidence of "contrary congressional intent" to rebut that presumption. Therefore, contrary to Plaintiffs' contention, Sullivan's decision to delegate her rulemaking power to Sobeck, a subordinate official within the agency, did not run afoul of the MSA.

Plaintiffs also advance a fallback position. They maintain that, even if the MSA itself permits the Secretary's designee—the Assistant Administrator of NOAA—to sub-delegate rulemaking authority to a subordinate official, her sub-delegation to Sobeck was invalid because it violated NOAA's internal policies. Plaintiffs base that contention on their interpretation of Section 26 of the NOAA Organizational Handbook Transmittal No. 61 (the "NOAA Organizational Handbook" or "the Handbook"), which provides, in relevant part:

> The Under Secretary/Administrator redelegates to the Assistant Administrator for Fisheries, with noted conditions and reservations, the authority to perform functions relating to:
>
> . . . .
>
> 26. The Magnuson Fishery Conservation and Management Act, 16 U.S.C. 1801–1882, with the following functions:
>
>     a. The Under Secretary must be advised before final action is taken with respect to the following functions:
>
> . . . .
>
>         iv. Approving, disapproving, partially disapproving, or issuing a fishery management plan or amendment, or issuing implementing or emergency regulations, if the Assistant Administrator considers the action to be controversial *(1853 and 1854)*.

*See* U.S. DEP'T OF COMMERCE, *NOAA Organizational Handbook Transmittal No. 61*, at Part II(C)(26) (Feb. 24, 2015), http://www.corporateservices.noaa.gov/ames/delegations_of_authority/ transmittal-61.pdf [hereinafter NOAA Organizational Handbook] (emphasis added). Emphasizing Section 26(a)(iv)'s specific reference to sections 351 and 352 of the MSA, codified at 16 U.S.C. §§ 1853 and 1854, respectively, Plaintiffs posit that the NOAA Organizational Handbook allows the Assistant Administrator of NOAA to delegate rulemaking authority only as to those two code provisions, but not as to the Secretary's general rulemaking authority under a different code section, 16 U.S.C. § 1855(d). Pls.' Reply at 6–7. Based on that understanding of the Handbook, Plaintiffs' argument continues, the assignment of authority to Sobeck that resulted in the Rule violated NOAA's own internal policies because the sub-delegation of rulemaking authority at issue here arose under 16 U.S.C. § 1855(d), not § 1853 or § 1854. *Id.*

Plaintiffs read the NOAA Organizational Handbook far too narrowly. Section 26 of the Handbook expressly "redelegates to the Assistant Administrator of Fisheries, with noted conditions and reservations, the authority to perform functions *relating to* . . . [t]he Magnuson Fishery Conservation and Management Act, 16 U.S.C. [§§] 1801–1882." NOAA Organizational Handbook (emphasis added). The Handbook's use of the words "relating to," in combination with its citation to the full range of the MSA's corresponding code sections, supports a broad delegation of rulemaking authority to the Assistant Administrator of Fisheries with respect to the MSA in its entirety, and not only those sections cited by Plaintiffs. *Cf. Nat'l Fed'n of Fed. Emps. v. Cheney*, 883 F.2d 1038, 1044 n.14 (D.C. Cir. 1989) (finding that Congress granted the General Accounting Office broad authority by delegating to it the responsibility to investigate "all matters *relating to* the receipt and disbursement of public funds" (emphasis added)); *Adair v. Rose Law Firm*, 867 F. Supp. 1111, 1115 (D.D.C. 1994) (finding that the Inspector General Act's mandate that an

Inspector General "conduct, supervise, and coordinate audits and investigations *relating to* the programs and operations of [the agency]" constituted a "broad grant of authority rather than a limitation" (alteration in original) (emphasis added)). Contrary to Plaintiffs' interpretation, the Handbook only limits the authority of the Assistant Administrator of Fisheries insofar as she must *advise* the Under Secretary before taking particular final actions pursuant to 16 U.S.C. §§ 1821(h), 1851(b), 1852(b), 1853, and 1854, *see* NOAA Organizational Handbook, but does not limit her authority to *take action* under any particular provision of the MSA. Moreover, the Department issued the Rule pursuant to MSA § 307(1)(Q)—codified at 16 U.S.C. § 1857—and the Handbook does not purport to limit the authority of the Under Secretary or the Assistant Administrator of Fisheries with respect to that section in any way. Therefore, the Handbook, properly construed, clearly authorizes the transfer of rulemaking authority from Sullivan to Sobeck. Accordingly, neither the MSA nor NOAA's organizational policy impedes the sub-delegation that resulted in the Rule.

       3.       *Does the Absence of a Notice of Sub-Delegation in the Administrative Record Defeat the Rule?*

Next, Plaintiffs contend that, even if the MSA permits sub-delegation, there is no indication *in the administrative record* that a sub-delegation actually occurred. *See* Pls.' Mot. at 19. Plaintiffs, however, cite no authority for the proposition that such agency action must appear within the administrative record itself when the action is otherwise publicly documented. As already discussed, *see supra* Part IV.A.1, there exists a clear trail of official actions—available through the Department's websites, *see supra* notes 5–6—establishing the delegation and sub-delegation of rulemaking authority under the MSA to the Assistant Administrator of NOAA (Sullivan) and the Assistant Administrator of Fisheries (Sobeck), respectively. Thus, the intra-

Department delegations plainly occurred, and no statute or regulation required those delegations be written down within the administrative record to be deemed valid.

### 4. Did the Rule's Promulgation Violate the Appointments Clause?

The court turns now to the heart of Plaintiffs' delegation arguments: whether the Rule was promulgated in violation of the Appointments Clause. *See* Pls.' Mot. at 20–22. The Appointments Clause of the Constitution provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone . . . ." U.S. CONST. art. II, § 2, cl. 2. As written, the clause distinguishes between principal and inferior officers. *Tucker v. Comm'r of Internal Revenue*, 676 F.3d 1129, 1132 (D.C. Cir. 2012). In light of that textual difference, the Supreme Court has interpreted the Appointments Clause to require that "[p]rincipal officers [be] selected by the President with the advice and consent of the Senate[, whereas] [i]nferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley v. Valeo*, 424 U.S. 1, 132 (1976). The Clause's requirements do not apply to mere employees. *See Tucker*, 676 F.3d at 1132. Those classifications take on importance when it comes to rulemaking. The Supreme Court has held that, under the Constitution, only "Officers," both principal and inferior, have the power to issue rules; employees do not.[9] *See Buckley*, 424 U.S. at 141. Thus, as relevant here, only the President or the head of a department may appoint Officers with rulemaking authority.

In view of these constitutional principles, the central question presented by Plaintiffs' Appointments Clause challenge is whether the Rule was promulgated by an "Officer" with

---

[9] Plaintiffs also assert that "[i]nferior officers have no authority to issue legislative rules that are deemed significant because of their potential effect on foreign relations." Pls.' Reply at 15. Plaintiffs raise this argument for the first time in their Reply, however, so the court will not consider it. *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992).

rulemaking authority. Pls.' Mot. at 21–22. No one disputes that Rauch was an employee, not an Officer, and thus lacked rulemaking authority. Thus, if Rauch issued the Rule, its promulgation violated the Appointments Clause.

Where the parties join issue, however, is with regard to Sobeck. As to her, there are disagreements over two questions: (1) whether she was a duly appointed inferior Officer and, (2) if so, whether she, or Rauch, actually promulgated the Rule. Plaintiffs maintain that Sobeck was not appointed by either the President or the Secretary of Commerce, but rather, by a subordinate official and, thus, was not an inferior Officer with rulemaking authority. Pls.' Reply at 13–14. They also assert that, even if Sobeck was an inferior Officer, she did not exercise rulemaking authority with regard to the Final Rule, as published on December 9, 2016. *Id.* at 7. Federal Defendants, on the other hand, insist that Sobeck was "appointed by the Secretary of [Commerce], subject to approval of the President" and, therefore, was an inferior Officer who had the power to promulgate the Rule. Fed. Defs.' Mot. at 43–44 (citing Reorganization Plan No. 4 of 1970, § 2(e)(1), 84 Stat. 2090, 2091 (1970)); Fed. Defs.' Reply at 21–23. They also assert that Sobeck in fact issued the Final Rule because she "stayed involved in the inter-agency discussions on the content of the Final Rule between August and late November 2016 and engaged with NOAA and NMFS leadership on the contents of the Final Rule." Fed. Defs.' Reply at 24.

Unfortunately, the administrative record presents a muddled picture. Plaintiffs advance two pieces of evidence to support their position that Sobeck was not an inferior Officer. First, Plaintiffs cite to a NOAA press release announcing Sobeck's appointment, which states: "Today, Dr. Kathryn Sullivan, acting NOAA administrator, appointed Eileen Sobeck as assistant administrator for NOAA Fisheries."[10] Second, they point to Federal Defendants' Answer, in

---

[10] *See* NAT'L OCEANIC AND ATMOSPHERIC ADMIN. OFFICE, *Eileen Sobeck named assistant administrator for NOAA Fisheries* (Jan. 15, 2014), http://www.noaanews.noaa.gov/stories2014/20140115_sobeck.html.

which Federal Defendants "admit[ted] that Ms. Sobeck was appointed by Dr. Sullivan." Fed. Defs.' Answer ¶ 17. Plaintiffs maintain that the Department's own press release and binding admission establish that Sobeck was appointed not by the President or the Secretary, but by an official (Sullivan) who did not have the authority to designate Officers. *See* Pls.' Reply at 13. As to whether Sobeck actually exercised rulemaking authority even if she was an inferior Officer, Plaintiffs point out that Rauch, not Sobeck, signed the Final Rule. *Id*. at 7–8.

Federal Defendants counter with their own evidence. They submitted two extra-record affidavits from Denise Yang, the Director of the Department's Office of Executive Resources. In the first, Yang attested that "Secretary of Commerce Penny Pritzker appointed Ms. Sobeck" with the approval of the President, *see* Fed. Defs.' Reply, Ex. 1, ECF No. 65-1, ¶ 3, and in the second, she provided personnel records purporting to show that Sobeck's appointment was consistent with the process for Secretarial appointments, Fed. Defs.' Notice of Additional Info., ECF No. 80 [hereinafter Fed. Defs.' Notice], Ex. 1, ECF No. 80-1, ¶¶ 6–8; Fed. Defs.' Notice, Ex. 2, ECF No. 80-2. Federal Defendants also insist that the court should disregard the evidence cited by Plaintiffs, i.e., the NOAA press release and their Answer, because both are inaccurate and are the product of inadvertent errors. *See* Fed. Defs.' Mot. at 44 n.33 (explaining the NOAA press release contained a "misstatement" about who appointed Sobeck); Fed. Defs.' Reply at 21; Fed. Defs.' Mot. for Leave to Am. Answer, ECF No. 64, at 2–3 (explaining that their Answer was incorrect and seeking leave to amend). And, as to whether Sobeck actually exercised rulemaking power, Federal Defendants cite a series of e-mails in the administrative record, which they contend show that Sobeck stayed involved in the inter-agency discussions regarding the Final Rule. Fed. Defs.' Reply at 24 (citing A.R. at 020614, 032610, 018203, 019884, 020288, 020308, 020350, 020521, 021122, 021875, 022043, 025289, 025301, 032789). Upon closer inspection, however, those e-

mails show Sobeck playing only a limited role in the Final Rule's promulgation.[11]  Suffice it to say, this hodgepodge of misstatements, retractions, ambiguous record evidence, and untested extra-record evidence offers little clarity on whether the Rule was promulgated in violation of the Appointments Clause.[12]

In light of this factual morass, this court embarked on a different course.  After oral argument on the parties' motions, in a Memorandum Opinion and Order issued on June 22, 2017, the court invited Federal Defendants to have the current Secretary of Commerce, Wilbur Ross, ratify the Rule.  *See* Mem. Op. & Order, ECF No. 83 [hereinafter Mem. Op. & Order].  Federal Defendants accepted the court's invitation by submitting a sworn affidavit from Secretary Ross.  *See* Fed. Defs.' Resp. to Order of the Court, ECF No. 84, Ex. 1, ECF No. 84-1 [hereinafter Ross Decl.].  Secretary Ross attested:

> [T]o resolve this question, and in response to the Court's Order, I state that I have knowledge of the contents, purpose, and requirements of the Final Rule and its supporting documents, and I hereby affirm and ratify the Final Rule as it was published in the Federal Register on December 9, 2016, including all regulatory analysis certifications contained therein.

*Id*. ¶ 4.  In the court's view, Secretary Ross' under-oath ratification of the Rule cures any potential Appointments Clause defects in its promulgation.  *See* Mem. Op. & Order at 2–5.  Because the

---

[11] Sobeck is simply copied on the majority of the e-mails, and those few that she authored concern a document supporting the Final Rule, not the Final Rule itself.  *See, e.g.*, A.R. at 020288, 032789.

[12] Intervenor-Defendant takes a different approach.  It contends that challenges under the Appointments Clause "are structural, not procedural," and thus it is irrelevant what actual role Sobeck had in the decision-making process. Intervenor-Def. Alaska Bering Sea Crabbers' Reply in Supp. of Cross-Mot. for Summ. J., ECF No. 66 [hereinafter ABSC Reply], at 9–10.  According to Intervenor-Defendant, under *Estes v. United States Department of Treasury*, an agency can overcome an Appointments Clause challenge as long as it demonstrates a clear chain of delegation from a Presidential appointee with rulemaking authority to a designee also with rulemaking authority; thus, the actual conduct of the Officer issuing the rule is irrelevant.  *See id.* (citing 219 F. Supp. 3d 17, 38 (D.D.C. 2016)).  But *Estes* is a different case, because there the question involved whether the official in question was a principal Officer.  *See* 219 F. Supp. 3d at 37–38.  *Estes* did not attempt to answer the question posed here, which is, assuming Sobeck is an inferior Officer with rulemaking authority, what is the evidence that she actually exercised such authority with respect to the Final Rule?  Intervenor-Defendant's alternative approach does not provide a satisfactory answer to that factual question.

court explained in its Memorandum Opinion its reasoning for that conclusion, the court does not repeat that reasoning here. *See id.*

Plaintiffs disagree that Secretary Ross' declaration surmounts their Appointments Clause challenge for three reasons. *See* Pls.' Resp. to Defs.' June 30 Filing, ECF No. 85 [hereinafter Pls.' Resp. to June 30 Filing]. First, Plaintiffs assert that "ratification does not apply retroactively to cure an Appointments Clause violation where, as here, the original Rule was issued by" Sobeck or Rauch, non-Officers who lacked the constitutional capacity to issue binding legislative rules. *Id.* at 1. Second, Plaintiffs maintain that accepting Secretary Ross' ratification would be improper here because "it would undermine rights that existed prior to the ratification" of U.S.-based harvesters that exported seafood for re-importation before the interim Rule was published. *Id.* at 1, 5. Third, Plaintiffs argue that, even if Secretary Ross could legally ratify the Rule, the form of his actual ratification—i.e., sworn affidavit—is insufficient because, like the Rule itself, that ratification had to be published in the Federal Register in order to be effective. *Id.*

The court finds none of these arguments persuasive. Plaintiffs' first argument—that Secretary Ross' ratification is ineffective because neither Sobeck nor Rauch possessed constitutional authority to make rules at the time the agency issued the Final Rule—rests on the definition of "ratification" found in the Restatement (Second) of Agency. *Id.* at 2. That definition provides: "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." RESTATEMENT (SECOND) OF AGENCY § 82 (1958) [hereinafter Restatement]. Plaintiffs assert that, under that definition, ratification only applies when "the person performing the prior act, *i.e.*, the agent, had the requisite legal capacity and only lacked the required authorization." Pls.' Resp. to June 30 Filing at 2. Stated differently, Plaintiffs

maintain that ratification does *not* apply where the person performing the prior act "initially lacked the legal capacity to take the action subject to the putative ratification." *Id*. So, as applied here, Plaintiffs claim that Secretary Ross cannot ratify the Rule because neither Sobeck nor Rauch had the "legal capacity" to issue a binding rule in the first place.

Plaintiffs miss the mark for two reasons. First, the court is unconvinced that the Restatement definition of "ratification" applies to the question at hand. The Restatement makes clear that ratification, "as the word is here used, represents a legal concept in *the law of agency* describing the relations between the parties after affirmance by a person of a transaction done or purported to be done for him." Restatement § 82, cmt. a (emphasis added). The question in this case does not, however, arise under "the law of agency," i.e., whether Sobeck's or Rauch's issuance of the rule was "done or purported to be done" for an Officer with rulemaking authority. Instead, the question presented is one of administrative law, i.e., whether the current Secretary can ratify a rule that his agency, under the stewardship of his predecessor, had the legal authority to promulgate. The Restatement of Agency seems ill-suited to answer that question. Second, even if the Restatement's definition of ratification does apply by analogy in the administrative law context, Plaintiffs' understanding of that definition is incorrect. Ratification is not, as Plaintiffs insist, limited only to those situations in which the original actor had requisite legal authority, but lacked the principal's authorization, to perform the act that is later ratified. To the contrary, the Restatement is replete with illustrations showing that a principal may ratify an act performed by someone who acted both without legal authority *and* without authorization. *See, e.g.*, *id*. § 84, cmt. a, illus. 2 ("In the absence of P, the owner and manager of a small newspaper, his friend, A, takes charge without authority and publishes several issues. In the course of these, he libels T. On P's return, he affirms the publication. P is subject to liability to T."); *id*. § 85 cmt. b, illus. 3 ("A

forges P's name to a note and, purporting to be the owner, sells it to T, saying it was signed by P. P affirms.  There is ratification and P is liable to T.").  Moreover, the Restatement makes clear that an act that qualifies for ratification "may be the act of an agent authorized to do other acts, *or it may be the act of a stranger*."  *Id*. § 84, cmt. a (emphasis added); *accord id*. § 85 ("Ratification does not result from the affirmance of a transaction with a third person unless the one acting *purported* to be acting for the ratifier." (emphasis added)).  Considering that a stranger could never possess the "legal authority" to act on behalf of someone, Plaintiffs' argument, taken to its natural conclusion, contradicts the Restatement definition on which it relies.  Accordingly, even if the Restatement of Agency governs Sobeck's or Rauch's issuance of the Rule, it presents no barrier to Secretary Ross' ratification of that act.[13]

In addition to the Restatement of Agency, Plaintiffs cite two cases—*Hardin County v. Trunkline Gas Company* and *Federal Election Commission v. NRA Political Victory Fund*—to support their argument that the ratification here was ineffective.  Pls.' Resp. to Defs.' June 30 Filing at 2 (citing 330 F. 2d 789 (5th Cir. 1964) and 513 U.S. 88 (1994)).  Those cases, however, stand for an inapposite proposition, namely, that a principal cannot ratify an act that the principal himself lacks the legal capacity or authority to carry out.  In *Hardin County*, the Fifth Circuit considered whether, under Texas law, the state legislature could ratify a highway improvement contract between Hardin County—a political subdivision of the state—and a construction company.  The court found that the contract was void as a matter of law because the County had

---

[13] Plaintiffs also use their interpretation of the Restatement to distinguish the cases that the court relied upon in its Memorandum Opinion concerning ratification.  Pls.' Resp. to June 30 Filing at 2–3.  Because their reading of the Restatement is incorrect, the court need not address Plaintiffs' efforts to distinguish those cases from the present one.  *Cf. State Nat'l Bank of Big Spring v. Lew*, 197 F. Supp. 3d 177, 183 (D.D.C. 2016) (citing *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000), for the proposition that ratification can "cure[ ] . . . [Appointments Clause] error") (alterations in original)).

entered into the highway improvement contract after the state legislature had passed a law divesting counties of the legal capacity to enter into such contracts. That new legislation vested contracting authority solely in the Texas Highway Department, and the Texas Constitution explicitly prohibited the legislature from authorizing any county payments made without legal authority. Thus, the court held, the state legislature could not "ratify" the contract because it lacked constitutional authority to authorize any county payments earmarked for highway improvement. *Hardin Cty. v. Trunkline Gas Co.*, 311 F.2d 882, 884 (5th Cir. 1963), *vacated by* 375 U.S. 8 (1963), *remanded to* 330 F.2d at 792. Similarly, in *Federal Election Commission v. NRA Political Victory Fund*, the Supreme Court was faced with the question of whether the Solicitor General's "'after-the-fact' authorization" of a petition for certiorari filed by the Federal Election Commission ("FEC") was ineffective because the Solicitor General issued his "ratification" after the time for filing the petition had passed. 513 U.S. at 98. The Court explained: "Here, the Solicitor General attempted to ratify the FEC's filing on May 26, 1994, but he could not himself have filed a petition for certiorari on that date because the 90–day time period for filing a petition had expired on January 20, 1994. His authorization simply came too late in the day to be effective." *Id.* In other words, as the Solicitor General lacks the authority to late-file a petition for certiorari, he likewise lacks the authority to ratify a petition late-filed by someone else. Here, in sharp contrast to the principals in both *Hardin County* (the Texas state legislature) and *NRA Political Victory Fund* (the Solicitor General), there is no dispute that Secretary Ross has the constitutional authority to do the very act he has ratified—promulgate the Rule. Thus, neither *Hardin County* nor *NRA Political Victory Fund* prevent the court from relying on Secretary Ross' ratification of the Rule.

Having found ratification appropriate in this context, the court makes quick work of Plaintiffs' remaining arguments. Plaintiffs' second argument—that ratification would undermine

the rights of Plaintiffs who exported seafood for re-importation before the Final Rule was issued or its effective date—is confusing. Plaintiffs have known since December 9, 2016, that the Rule's traceability requirements would take effect on January 1, 2018, and thus were on notice of the need to coordinate the collection of traceability data for seafood, if any, that Plaintiffs intend to re-import after the Rule's compliance date. How Secretary Ross' recent ratification purportedly impairs that group's interests is unclear. And, for reasons to be discussed, *see infra* Part IV.C.4, Plaintiffs fail to demonstrate that they will actually suffer any such harm.

Finally, Plaintiffs' contention that Secretary Ross' ratification is insufficient because it lacks the formality of rulemaking—i.e., publication in the Federal Register—is unfounded. Plaintiffs again rely on the Restatement of Agency, which provides that "[w]here formalities are requisite for the authorization of an act, its affirmance must be by the same formalities in order to constitute a ratification." Restatement § 93(2). As noted earlier, the court questions whether the Restatement of Agency controls ratification in this context. That is particularly true with regard to the methods of ratification, given that the Restatement's illustrations of formalities involve those associated with commercial transactions, such as affixing a seal and the making of a writing, not agency rulemaking. *See id*. § 93(2) cmt. b. Moreover, at least one court in this District has found that an Officer can ratify an administrative action through a sworn declaration submitted in the course of litigation. *See Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, No. 16-1433, 2016 WL 8738419 (D.D.C. Oct. 3, 2016)). In any event, even if ratification requires publication in the Federal Register, *cf. State Nat'l Bank of Big Spring v. Lew*, 197 F. Supp. 3d 177, 180 (D.D.C. 2016) (ratification published), Federal Defendants have ample time to take that step before the Rule goes into effect. Thus, non-publication at this juncture cannot form the basis for the remedy that Plaintiffs seek—i.e. nullifying the Rule.

To summarize, the court holds that Secretary Ross' sworn affidavit ratifies the Rule. Thus, even if Sobeck's or Rauch's issuance of the Rule violated the Appointments Clause, the Secretary's ratification cures that infirmity. The same is true as to Sobeck's alleged failure to exercise rulemaking authority with respect to issuance of the Final Rule. Accordingly, the court rejects Plaintiffs' contention that the Rule's promulgation violates the Appointments Clause.

## B. Does the Department Have the Statutory Authority to Issue the Rule?

Plaintiffs next urge the court to invalidate the Rule on the basis that the Department lacks the statutory authority to regulate seafood fraud. Plaintiffs assert, instead, that Congress vested sole authority to regulate seafood fraud in the Food and Drug Administration ("FDA"). Pls.' Mot. at 13–14. Additionally, they maintain that, under the MSA, the Department's rulemaking authority is restricted to addressing the problem of IUU fishing and that, by extending its regulatory authority to seafood fraud, the Department exceeded its jurisdiction under the statute. *Id*. at 13. The court addresses each argument in turn.[14]

### 1. Does the FDA Have Sole Regulatory Authority over Seafood Mislabeling?

Plaintiffs' first contention that the FDA has exclusive authority to regulate labeling is effectively foreclosed by Supreme Court precedent. In *POM Wonderful LLC v. Coca-Cola Company*, the Court held that the Food, Drug, and Cosmetic Act ("FDCA") does not confer *exclusive* jurisdiction over food labeling to the FDA and, instead contemplates that the FDA will work within "complementary" federal legal and regulatory frameworks to effectively address mislabeling concerns. 573 U.S. ___, ___, 134 S. Ct. 2228, 2241 (2014). In that case, POM

---

[14] Federal Defendants' insistence that the Rule does not "regulate" seafood fraud, but is instead a mere procedural reporting and recordkeeping rule, is unconvincing. Fed. Defs.' Reply at 6. The focus on combating seafood fraud, in conjunction with reducing IUU fishing, is apparent from the title of the President's Memorandum establishing the IUU Task Force: "Memorandum Establishing a Comprehensive Framework to Combat Illegal, Unreported, and Unregulated Fishing *and* Seafood Fraud." A.R. at 000001 (emphasis added). It therefore is not credible to assert that the Rule merely concerns reporting and recordkeeping, when it was clearly designed, at least in part, to address the problem of seafood fraud.

Wonderful, a producer and seller of pomegranate juices, sued Coca-Cola under the Lanham Act, which enables competitors to bring unfair competition lawsuits based on deceptive product labeling. POM Wonderful claimed that Coca-Cola's description of a juice blend it sold misled consumers to POM Wonderful's detriment. *Id*. at 2235. The Supreme Court held that the FDCA did not preclude POM Wonderful's Lanham Act suit because the FDCA—which protects public health and safety—and the Lanham Act—which safeguards business interests against unfair competition—were complementary statutes tailored to address different aspects of the same problem: product mislabeling. *Id*. at 2237–39. The Court began with the text of the statutes, noting first that the FDCA did not forbid, "in express terms," mislabeling claims brought under the Lanham Act. *Id*. at 2238. The Court then proceeded to find that the purposes of the statutes were consistent with respect to both enforcement and remedies concerning mislabeling, describing the advantages of that relationship as follows:

> Although both statutes touch on food and beverage labeling . . . the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety . . . [and] [t]he two statutes impose different requirements and protections[,] . . . [thus] [a]llowing Lanham Act suits to take[] advantage of synergies among multiple methods of regulation. This is quite consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers . . . [and] if Lanham Act claims were to be precluded then commercial interests—and indirectly the public at large—could be left with less effective protection in the food and beverage labeling realm than in many other, less regulated industries.

*Id*. at 2238–39 (citations and internal quotation marks omitted). In other words, the Court held that the FDCA and Lanham Act were not in conflict, although directed at addressing the same problem (juice labeling), because the two statutes aimed to protect separate, and complementary, interests—public health (FDCA) and commercial trademarks (Lanham Act).

The FDCA and MSA are equally complementary. Much like the Lanham Act, the purposes of the MSA are consistent with, and do not contradict, those of the FDCA. As the Court noted in *POM Wonderful*, the primary concern of the FDCA is to "protect public health and safety." *Id*. The MSA, on the other hand, protects a broad array of interests, including: (1) "existing fishing [stock]"; (2) "[c]ommercial and recreational fishing" jobs; (3) "[i]nternational fishing agreements"; and (4) existing "fishery resources." 16 U.S.C. § 1801(a)(2)–(5). That the MSA also provides secondary benefits to the public health and welfare does not render the statute in conflict with the FDCA, and, in fact, "is quite consistent with the congressional design to enact two different statutes, each with its own mechanisms to enhance the protection of competitors and consumers," with respect to seafood mislabeling. *POM Wonderful*, 134 S. Ct. at 2238–39. And the Department recognized these potential enforcement synergies in its rulemaking, noting that the FDA "does not currently administer any laws or programs which enable the U.S. government to ensure that seafood products imported into the United States were not taken, possessed, transported, or sold in violation of any foreign law or regulation." A.R. at 006909. Likewise, "the co-mingling of legally harvested and IUU seafood products between the point of harvest and entry into U.S. commerce would not be identified by existing FDA inspections." *Id*. To bar the Department from filling these kinds of enforcement gaps through the Rule, in the absence of clear congressional intent to do so, would foreclose the kind of "synergies" that *POM Wonderful* endorsed. *See POM Wonderful*, 134 S. Ct. at 2239. Thus, the court finds no basis to invalidate the Department's Rule simply because it "touches on" an area over which the FDA also has regulatory authority. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) ("[T]here is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.").

Plaintiffs' reliance on *Gonzales v. Oregon* does not change the court's conclusion. *See* Pls.' Mot. at 14 (citing 546 U.S. 243 (2006)). In *Gonzales*, the Supreme Court held that the Attorney General did not have authority, under the Controlled Substances Act ("CSA"), to issue regulations prohibiting doctors from prescribing CSA-regulated substances for use in state-sanctioned, physician-assisted suicides. Under the CSA, Congress delegated to the Attorney General the authority to "promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances and to listed chemicals." *Gonzales*, 546 U.S. at 259 (quoting 21 U.S.C. § 821). The Court found, however, that the text of the CSA also contained several limitations on the Attorney General's authority to regulate CSA-designated substances, including granting the Secretary of Health and Human Services sole authority over regulating the use of CSA-designated substances in the medical context. *Id*. at 259–63. Understood this way, *Gonzales* is readily distinguishable. The CSA specifically prohibited the Attorney General from regulating the very subject matter that he sought to regulate in that case—medical drug use—and so the Court found that the Attorney General had acted outside of his statutory authority. Not so here. The MSA does not contain any carve-outs to the Department's regulatory jurisdiction along the lines of the CSA's distribution of authority between the Attorney General and the Secretary of Health and Human Services. The MSA does not even mention, let alone concern, the FDA's jurisdiction over mislabeling, and Plaintiffs point to no other statute purporting to grant the FDA exclusive jurisdiction in that area. Thus, *Gonzales* does not alter the court's conclusion that, in light of *POM Wonderful*, the Department has not drifted into waters exclusively regulated by the FDA.

2. *Does the MSA Grant the Department Authority to Regulate Seafood Fraud?*

Plaintiffs next argue that, even if the FDA does not have exclusive jurisdiction over seafood fraud, Congress did not grant the Department the authority to regulate seafood fraud *under the MSA*. Pls.' Mot. at 15–17. Plaintiffs contend: "Nothing in the MSA or any other statute authorizes the Secretary of Commerce to issue rules with respect to seafood mislabeling." *Id.* at 15. That argument, even though Plaintiffs never mention it in their briefing, necessarily implicates the two-step formula set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44 (1984). *See City of Arlington v. FCC*, 569 U.S. ___, ___, 133 S. Ct. 1863, 1868–69 (2013). Under *Chevron*'s first step, courts must determine whether Congress has "directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of matter[.]" *Id.* at 1868 (quoting *Chevron*, 467 U.S. at 842). On the other hand, "if the statute is silent or ambiguous with respect to the specific issue," *Chevron*, 467 U.S. at 843, the question for the court "is not whether [it] think[s] the [agency]'s interpretation is correct, but whether the [agency]'s interpretation of the Act is at least reasonable in light of any ambiguities in the statute." *District of Columbia v. U.S. Dep't of Labor*, 819 F.3d 444, 449 (D.C. Cir. 2016). Under this second step of the *Chevron* analysis, the court will defer to the agency's construction of the statute so long as it is reasonable. *Council for Urological Interests v. Burwell*, 790 F.3d 212, 219 (D.C. Cir. 2015) (citing *Chevron*, 467 U.S. at 842–43).

The court's analysis begins, as it must, with the text of the MSA. The MSA authorizes the Secretary to "promulgate such regulations . . . as may be necessary . . . to carry out" the provisions of the statute. 16 U.S.C. § 1855(d). Thus, the plain text of the MSA grants the Department broad authority to issue any regulation deemed "necessary" to effectuate the underlying purposes of the statute. As pertinent here, the MSA provides the Department the authority to issue regulations that

"promote improved monitoring and compliance for high seas fisheries, or fisheries governed by international fishery management agreements, and to implement the requirements" of the MSA. *Id*. § 1829(a).  Moreover, in 2007, Congress amended 16 U.S.C. § 1857 to add subsection (1)(Q), which makes it unlawful to "import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish taken, possessed, transported, or sold in violation of any foreign law or regulation."  *Id*. § 1857(1)(Q) (2007).  That amendment, in turn, expanded the authority of the Department to issue such regulations as necessary to carry out that section. Notably, the Department relies on 16 U.S.C. § 1857(1)(Q) as its source of authority to adopt the Rule.  A.R. 006909.  Then, in 2015, Congress enacted the Illegal, Unreported, and Unregulated Fishing Enforcement Act of 2015, which expanded the Department's authority under the MSA even further.  That Act amended 16 U.S.C. § 1826i to confer upon the Secretary the authority to issue regulations that take "appropriate action against listed [IUU] vessels and vessel owners" engaged in IUU fishing, Pub. L. No. 114-81, § 101(b), 129 Stat. 649, 654 (2015) (codified at 16 U.S.C. § 1826i(c)(2)), and to promulgate regulations to implement that new authority, *id*. § 101(b), 129 Stat. at 654 (codified at 16 U.S.C. § 1826i(d)).  It also extended the prohibitions under 16 U.S.C. § 1857(1)(Q) to include any seafood taken, possessed, transported, or sold in violation of "any treaty or in contravention of any binding conservation measure adopted by an international agreement or organization to which the United States is a party."  *Id*. § 112, 129 Stat. at 659 (codified at 16 U.S.C. § 1857(1)(Q)).  Through these actions, Congress has gradually expanded the Secretary's regulatory authority under the MSA to address IUU fishing that is unlawful under either U.S. or foreign law.

While the text of the MSA does not grant the Department the authority to issue regulations pertaining to seafood fraud specifically, *see* Pls.' Mot. at 15–17, its grant of authority to the

Secretary to issue such regulations "necessary" to "carry out" the underlying purpose of the MSA, when viewed in light of its legislative history, makes clear that Congress intended for the MSA to authorize the Department to regulate seafood fraud. *See Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) ("Although *Chevron* step one analysis begins with the statute's text, the court must . . . *exhaust* the traditional tools of statutory construction, including examining the statute's *legislative history* . . ." (emphasis added) (internal quotation marks omitted)); *cf. Catawba Cty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (per curiam) (stating that "a statute may foreclose an agency's preferred interpretation . . . if its structure, *legislative history*, or purpose makes clear what its text leaves opaque" (emphasis added)); *Am. Bankers Ass'n v. NCUA*, 271 F.3d 262, 268–271 (D.C. Cir. 2001) (finding text ambiguous but resolving case at *Chevron* step one on account of "pellucid" legislative history). Congress surely knew in 2015 that, in the prior year, the President had formed the "Presidential Task Force on Combating Illegal, Unreported, and Unregulated Fishing and *Seafood Fraud*," in part, to combat seafood fraud and that the Department would be taking the lead on rulemaking. Both the Senate and House Committee Reports for the Illegal, Unreported, and Unregulated Fishing Enforcement Act of 2015 noted that the purpose of the law was to grant the Department further tools to administer fisheries laws and tackle IUU fishing. S. REP. NO. 114-166, at 8 (2015); H.R. REP. NO. 114-212, at 18 (2015). In fact, the Senate Report expressly cites a public meeting of the IUU Task Force, S. REP. NO. 114-166, at 2, and a Congresswoman explicitly referenced the work of the Task Force in a floor debate, stating that the law "includes provisions that were specifically requested by the Task Force." 161 CONG. REC. H5486 (daily ed. July 27, 2015) (statement of Rep. Bordallo). Congress' decision to expand the Secretary's regulatory powers under the MSA, while knowing that the Secretary, through the IUU Task Force, was focused on seafood fraud, strongly suggests that Congress intended for the

Secretary to exercise rulemaking authority to prevent seafood fraud. *Cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983) (considering as relevant to the agency's interpretation of its statutory authority the fact that Congress, even after becoming aware of the agency's position, had repeatedly failed to contradict that position). "Congress knows to speak in plain terms when it wishes to circumscribe . . . agency discretion," *City of Arlington*, 133 S. Ct. at 1868, and it did not do so here, even though it was clearly aware of the Secretary's intention to regulate seafood fraud. Thus, in light of its text and legislative history, the MSA affords the Secretary authority to regulate seafood fraud.

Even if the court were to find the text of the MSA ambiguous as to the Department's authority to regulate seafood fraud, the court would nevertheless defer to the Department's reasonable conclusion that the MSA provides it with that authority. *Id*. The court will assume for sake of argument that, because the MSA does not explicitly reference "seafood fraud," the answer to the question whether regulating seafood fraud is in fact "necessary" to "carry out" the provisions of the MSA is ambiguous. Even so, the court finds that the Department reasonably interpreted the MSA to cover seafood fraud in light of Congress' broad grant of authority under the MSA to combat IUU fishing. For reasons the court will discuss, IUU fishing is often inextricably intertwined with seafood fraud. *See infra* Part IV.C.2. For instance, the President's Memorandum establishing the IUU Task Force expressly provides that "[i]t is in the national interest of the United States to promote a framework that supports sustainable fishing practices *and* combats seafood fraud and the sale of IUU fishing products." A.R. at 000001 (emphasis added). Additionally, the Task Force noted multiple areas of overlap between IUU fishing and seafood fraud, e.g., when a product is mislabeled to conceal illegal capture, or when species are comingled to enhance profits. *See id*. at 013103. The Task Force thus concluded that both problems could "be effectively

addressed through traceability within the scope of [the Rule] (from the point of harvest or production to entry into U.S. commerce) because both are enabled by lack of transparency within the seafood supply chain." *Id*. at 006910. Notably, the Task Force also identified the MSA as an existing source of authority that the federal government could rely on—and should enhance—in order to effectively combat this dual-headed problem. *See id*. at 013105. The Department, in turn, concluded that regulating seafood fraud was wholly "necessary" to "carry out" its authority to prevent IUU seafood product from entering the United States. Against this backdrop, the court finds that the Department's interpretation of the scope of its authority is reasonable under *Chevron*.

The court also disagrees with Plaintiffs' assertion that a related statute, the Lacey Act, 16 U.S.C. §§ 3371–3378, originally passed in 1900 in order to ban trafficking illegal wildlife, renders the Department's interpretation of the MSA unreasonable. Pls.' Mot. at 16; Pls.' Reply at 21. Plaintiffs insist the fact that the Lacey Act contains nearly identical language to the MSA concerning IUU fishing, *compare* 16 U.S.C. § 3372(a)(1) *with id*. § 1857(1)(Q), but also contains a provision governing seafood fraud offenses not found in the MSA, *see id*. § 3372(d), "strongly suggests that the MSA provides no independent basis for Commerce to regulate seafood fraud." Pls.' Reply at 2. Put another way, Plaintiffs contend that interpreting the MSA as authorizing the Department to regulate seafood fraud would render the Lacey Act's specific provisions governing seafood fraud superfluous. *Id*. Plaintiffs further contend that, to the extent that the Department has authority to regulate seafood fraud, the Lacey Act requires that the agency "jointly promulgate" any such regulations with the Department of the Interior. Pls.' Mot. at 16 (citing 16 U.S.C. § 3376(a)(2)). In short, Plaintiffs contend that the only way to harmonize the two statutes is to read the MSA *not* to reach seafood fraud. *See* Pls.' Reply at 21–22.

Plaintiffs' argument, however, fails because, as just discussed, the fact that the MSA does not contain explicit reference to seafood fraud does not mean Congress intended to prohibit the Department from regulating it under the statute. Plaintiffs are correct that one of the Lacey Act's objectives is to prohibit the false labeling of seafood imported into the United States. 16 U.S.C. § 3372(d). Nothing in the text of the Lacey Act, however, designates the Act as the *exclusive* source of authority for promulgating regulations to combat seafood fraud. The Lacey Act expressly prohibits seafood mislabeling, *id.*, and provides the Department with authority to issue regulations governing the *contents* of seafood labels, 16 U.S.C. § 3376(b); while the MSA, on the other hand, grants the Department broad authority to regulate all aspects of IUU fishing, including by authorizing the Secretary to issue regulations designed to deter *labeling violations* before they occur. There is simply nothing inconsistent between those two statutory regimes. *Cf. Massachusetts*, 549 U.S. at 532. Further, while the Lacey Act prohibits mislabeling of seafood, 16 U.S.C. § 3372(d), the Act does not expressly provide any agency authority to promulgate regulations to support that purpose. In Section 3376(a), Congress specified those provisions of the Lacey Act as to which certain agencies may promulgate regulations, 16 U.S.C. § 3376(a), but the Act's false labeling prohibition upon which Plaintiffs' argument rests, 16 U.S.C. § 3372(d), is not listed. Therefore, Plaintiffs' argument that regulations concerning seafood fraud can only be promulgated under the Lacey Act is arguably foreclosed by the text of the Act itself.

Moreover, Plaintiffs' suggestion that the Department is obligated under the Lacey Act to confer with the Secretary of the Interior before issuing regulations targeting seafood fraud is misplaced. The provision of the Act on which Plaintiffs rely, Section 3376(a)(2), governs the Secretary's authority to promulgate regulations concerning how a "container or package [of imported seafood must be] plainly marked, labeled, or tagged," to qualify for import into the

United States. 16 U.S.C. § 3376(a)(2); *see also id*. § 3372(b). In other words, it addresses regulations governing the type of information that must be affixed to a container or package of imported seafood. *See* 50 C.F.R. § 14.81 (regulation, titled "Marking Requirement," requiring containers or packages of imported seafood to "conspicuously" state the name and address of the shipper and consignee and be accompanied by an "accurate and legible" list of contents "by species scientific name and the number of each species"); *id*. § 14.82 (setting forth alternatives and exceptions to marking requirement). Section 3376(a)(2) does not, however, circumscribe the Department's authority to issue regulations designed to *curb labeling violations*. Moreover, as just discussed, the Lacey Act on its face does not contain an express grant of authority to any agency to promulgate regulations pertaining to the prohibition against seafood mislabeling. Therefore, nothing in the text of the Lacey Act supports Plaintiffs' contention that regulations aimed at deterring seafood fraud must be jointly issued with the Secretary of the Interior. Thus, neither of Plaintiffs' arguments concerning the Lacey Act convince the court that the Act precludes the Department from regulating seafood fraud under the MSA.

Finally, Plaintiffs point to a single e-mail written by Samuel Rauch contained in the administrative record to argue that the Department lacks authority under the MSA to regulate seafood fraud. Specifically, in an e-mail sent September 22, 2015, Rauch stated that, in his opinion, "there is no direct authority for [regulating seafood] fraud" under the MSA. A.R. at 019459. Plaintiffs contend that Rauch's "admission . . . should end the merits portion of the case" because even Department employees would acknowledge that the Rule exceeds the bounds of the MSA. Pls.' Mot. at 15. Plaintiffs, however, place too much stock in a lone e-mail communication. Plaintiffs cite no authority for the novel proposition that the personal opinion of a single agency employee, expressed before a regulation is finalized, can displace the agency's *final* position

regarding the scope of its jurisdiction. Indeed, this case illustrates why embracing such a proposition would be unwise. Rauch's September 2015 e-mail was written over a year before the agency issued the Final Rule, and Plaintiffs offer no context for the e-mail when written. Moreover, Rauch signed the Final Rule as published in the Federal Register in December 2016, A.R. at 006928, and Plaintiffs point to no record evidence showing that, at that critical moment, Rauch dissented from the Department's assertion of authority under the MSA. And, even were the court to take the e-mail at face value, it merely states that Rauch did not believe that there was "direct authority" under the MSA to regulate seafood fraud. That is not the same as concluding that the MSA grants *no* such authority. Rauch's isolated, vaguely worded e-mail does not undermine the court's conclusion that the Department exercised its regulatory authority consistent with the scope of the MSA.

Accordingly, the court rejects Plaintiffs' contention that the Department exceeded its authority under the MSA in promulgating the Rule.

### C.    Does the Rule Violate the APA?

The court turns next to Plaintiffs' arguments concerning the Rule and the APA. Pls.' Mot. at 22–33. Plaintiffs advance a multifaceted attack. First, they argue that the Rule violates the APA's notice-and-comment requirements because the Department failed to publicly disclose certain data that it relied upon in developing the priority species list. *See id*. at 22–25. Second, Plaintiffs assert that the Rule is arbitrary and capricious because the Department (1) relied on insufficient data in developing the Rule; (2) relied on flawed assumptions in estimating the Rule's compliance costs; and (3) set an illogical and overly burdensome compliance date. *See id*. at 25–33.

Under the APA, a reviewing court may "hold unlawful and set aside an agency action" it deems to be "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). When analyzing agency action under the "arbitrary and capricious" standard, courts must determine whether the action at issue was based on "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 57 (1983) (internal quotation marks omitted); *see also Republican Nat'l Comm. v. FEC*, 76 F.3d 400, 407 (D.C. Cir. 1996). Generally, an agency has engaged in such analysis when the administrative record indicates it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). This deferential review is not toothless, however. A reviewing court must set aside an agency action as arbitrary and capricious where, for instance, the administrative record indicates that an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Although this standard is not "particularly demanding," *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993), and a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), a court cannot "supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

With these principles in mind, the court now considers each of Plaintiffs' arguments under the APA.

1. *Did the Department Improperly Withhold Data in Formulating the Priority Species List?*

Plaintiffs first take issue with the Department's failure to publicly disclose, and subject to comment, data that it used to develop the priority species list. Before diving into Plaintiffs' argument, some background about the priority species list is necessary.

The Department engaged in a multi-step process to create the priority species list. First, the Department identified seven "principles" to guide the selection of priority species: (1) enforcement capability; (2) existence of a catch documentation scheme; (3) complexity of the chain of custody and processing; (4) history of species substitution; (5) history of mislabeling; (6) history of fisheries violations; and (7) history of human health risks associated with the substitution or mislabeling of the particular species. *See* A.R. at 003971. The Department then compiled a "base list" of 61 imported seafood species. The Department developed that list by analyzing the following three factors: (1) the total annual value of domestic landing and international import (all species whose value exceeded $100 million were included on the base list); (2) the per-pound cost of each species (those species with high per-pound cost were placed on the base list because of the increased incentive to illegally harvest and import those species); and (3) agency expertise concerning the IUU-risks associated with each species. *Id.* Next, the Department endeavored to collect information about each of the 61 species on the base list. Such information included unspecified "verifiable data" obtained "from Customs and Border Protection (CBP), Food and Drug Administration (FDA), and NOAA databases, published reports, or data gathered by Regional Fisheries Management Organizations to which the United States is a member and whose scientific data is developed and reviewed with active U.S. government participation" (the "Verifiable Data"). *Id.*

With this information in hand, the Department commissioned "[s]ub-working groups based on subject matter expertise . . . to complete the analyses under each individual principle." *Id*. The sub-working groups presented their findings to the Department who, in turn, used those findings, as informed by the agency's subject-matter expertise, to determine the base species most "at risk of IUU fishing and seafood fraud." *Id*. That winnowing process is documented, in part, in a multi-page "At-Risk Matrix," which organizes the sub-working groups' findings into columns concerning each of the seven principles for each base species. *Id*.; *see also id*. at 00052103–38, 00052150–53. To the extent that the Verifiable Data pertained to one of the Department's seven principles, such data is reflected in the corresponding column on the At-Risk Matrix. Using the At-Risk Matrix, the Department performed an independent analysis of the "suite of risks" pertaining to each potential species by analyzing the relative weight to give each applicable risk factor for each species. "For example, a single documented case of species substitution for a species that is sold in high volumes was considered differently than one case for a species rarely found in U.S. markets." *Id*. at 003971. In this way, the Department tried to assess the overall risk of IUU fishing and seafood fraud associated with each of the 61 base species. Finally, relying on the information reflected in the "At-Risk Matrix," including the Verifiable Data; the recommendations of the sub-working groups; and its own subject matter expertise, the Department narrowed the base list from 61 species down to 13 priority species. The Department published in the Federal Register "[b]rief summaries" of its rationale for selecting each of the designated species. *Id*. at 004467–68.

At no point in the process, however, did the agency disclose the Verifiable Data and subject it to notice and comment. A "[d]etailed presentation of the data," the Department explained, "is protected from disclosure because of data confidentiality and enforcement implications." *Id*. at

004467. Plaintiffs contend that the Department's failure to disclose the Verifiable Data "effectively preclude[d] meaningful public comment" and "limits the agency's ability to support its rules with materials in the administrative record," which, in turn, hamstrings the court's ability to "discern the connection between the facts relied on and the choices made from the record and the agency decision." Pls.' Mot. at 22–25. The court agrees.

A series of cases from the D.C. Circuit makes clear that when an agency relies on data that is critical to its decision-making process, that data must be disclosed in order to provide the public an opportunity to meaningfully comment on the agency's rulemaking rationale. *See, e.g.*, *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982); *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236–37 (D.C. Cir. 2008). The D.C. Circuit has consistently maintained that "[i]n order to allow for useful criticism it is especially important for the agency to identify and make available *technical studies and data* that it has employed in reaching the decisions to propose particular rules." *Conn. Light & Power Co.*, 673 F.2d at 530 (emphasis added); *see also Am. Radio Relay League, Inc*., 524 F.3d at 237 ("It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment."). Thus, unless exempted, the Department was obligated to disclose the Verifiable Data to allow for meaningful comment. The Department admits that it did not do so.

Federal Defendants nevertheless defend the Department's non-disclosure of the Verifiable Data on two grounds. First, they assert that the agency conveyed general information about the Verifiable Data to the public as part of the "brief summaries" published in the Federal Register that contained the Department's reasons for each priority species' selection. *See* Fed. Defs.' Mot.

at 28 (citing A.R. at 003972–73, 004467–68).  Second, they argue that the Verifiable Data was

exempt from disclosure under the law enforcement privilege.  As to their first contention, Federal

Defendants are simply wrong.  None of the summaries contain a synopsis of the Verifiable Data,

or at least none that is obvious.  *See* A.R. at 003972–73, 004467–68.  Take, for instance, the

Department's explanation for designating king crab as a priority species:

> King crab (red) has a significant history of fisheries violations, and
> insufficient enforcement capability in some parts of the world.
> Additional IUU fishing risk is tied to the lack of an effective catch
> documentation scheme throughout the geographic range of fishing
> activity, despite rigorous reporting requirements in some areas,
> including the United States.  King crab is at risk of seafood fraud,
> mostly due to misrepresentation of product origin, as well as some
> species substitution.  Further, King crab is often transshipped before
> entering the United States, which increases the IUU fishing and
> seafood fraud risks.

*Id*. at 004467.  That statement does not provide a hint of information, in summary form or

otherwise, as to how the Verifiable Data influenced the Department's decision to designate king

crab.  Federal Defendants nevertheless insist that such information was disclosed because "the

species-specific summaries in NMFS's notices drew on information contained" in the At-Risk

Matrix, which is available in the public record.  Fed. Defs.' Mot. at 24.  However, large portions

of the publicly available version of the At-Risk Matrix are redacted in full, *see* A.R. at 00052103–

38, 00052150–53, including entire sections that appear to contain the Verifiable Data, *see id*. at

00052108 (excerpt of At-Risk Matrix for king crab).  Thus, Federal Defendants' contention that

the Verifiable Data can be gleaned from the "brief summaries" or the publicly available At-Risk

Matrix is not supported by the administrative record.[15]

---

[15] Intervenor-Defendant contends that "the law enforcement data NMFS withheld was not 'the most critical factual material that was used to support the agency's position,'" and thus the Department need not have disclosed it.  *See* ABSC Mot. at 20 (quoting *Prof'l Plant Growers Ass'n v. U.S. Dep't of Agric*., 942 F. Supp. 27, 32 (D.D.C. 1996)).  Whether or not the data can fairly be characterized as the "most critical factual material" is not, however, the proper inquiry.  Rather, the question is whether the agency "employed," *Conn. Light & Power Co*., 673 F.2d at 530, or

Federal Defendants' second justification for withholding the Verifiable Data—their invocation of the law enforcement privilege—fares no better. For starters, the Department's conclusory assertions of the law enforcement privilege in the Federal Register are insufficient. *See id.* at 004467. In this Circuit, the "[a]ssertion of . . . [the law enforcement privilege] requires: (1) a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege." *See Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (internal quotation marks omitted). The agency followed none of those formalities. Additionally, as the agency failed to properly invoke the privilege at the time of non-disclosure, Federal Defendants are barred from doing so now. *See Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001). And, even if they were not so barred, Federal Defendants in this case have satisfied none of the requirements to invoke the law enforcement privilege and thus fall prey to the same procedural deficiencies as the agency. As a result, Federal Defendants cannot successfully claim that the Verifiable Data is privileged and was exempt from disclosure, as neither the Department nor Federal Defendants asserted the privilege at the right time or in the right manner.

The Department's withholding of the Verifiable Data does not, however, sink the Rule or the priority species list. Plaintiffs are still required to demonstrate prejudice flowing from the agency's non-disclosure. The D.C. Circuit has stated that in cases where, as here, "an agency has

---

"relie[d]," *Am. Radio Relay League*, 524 F.3d at 237, on the data in promulgating the Rule. Here, it is obvious that the Department did so. The Department's statements in the Federal Register and redactions to the At-Risk Matrix show that the Department relied on the Verifiable Data to select, at least, 9 out of the 13 species on the priority species list, *see* A.R. at 004467–68, 00052103–38, 00052150–53. Reliance on the Verifiable Data to such an extent required disclosure under binding precedent.

relied on data or information that was not disclosed to commenters," the plaintiff must "show that an opportunity to comment regarding an agency's important information created enough uncertainty as to its possible affect on the agency's disposition." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109–10 (D.C. Cir. 2014) (internal quotation marks omitted). Put another way, to demonstrate prejudice, Plaintiffs must demonstrate that they "had something useful to say" about the undisclosed data that could have impacted the Department's decision-making. *Chamber of Commerce*, 443 F.3d at 905. On this score, Plaintiffs fall short. "As stakeholders," Plaintiffs maintain, "they have relevant information regarding the selection of species subject to the [R]ule and may have credibly challenged the selection if they had been given the opportunity to comment on the data relied upon by the agency." Pls.' Mot. at 23. Furthermore, they assert, by not disclosing the data, the agency "denied [them] the ability to assess the strengths and weaknesses of the [agency's] conclusions." *Id.* Those vague claims are not enough, however, to establish prejudice. Plaintiffs have done no more than say that they *might* have data or other information that *may* have had an effect on the agency's disposition. They have not, for instance, put forward any data or information that would cast doubt on any particular priority species designation. True, Plaintiffs find themselves in the difficult position of having to demonstrate prejudice without knowing the actual data they seek to rebut. Nevertheless, the Circuit has made clear that, to show prejudice, the plaintiff must "indicate with reasonable specificity what portions of the [data] it objects to and how it might have responded if given the opportunity." *Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8 (D.C. Cir. 1999) (internal quotation marks omitted). Having failed to supply such "reasonable specificity" here, Plaintiffs cannot succeed on their claim that failure to provide the Verifiable Data violated the APA's notice-and-comment requirement.

2.      *Did the Department Rely on Insufficient Data in Developing the Rule?*

Plaintiffs submit that the court also should vacate the Rule as arbitrary and capricious because it was based on insufficient data.  They generally assert that "there [is] no data in the administrative record showing a relationship between a traceability program and a reduction in IUU fishing or seafood fraud."  Pls.' Mot. at 24.  And they specifically challenge the purported lack of data to support the agency's designation of priority species, *see id*. at 24, 28–29, 32, and its choice to apply the Rule's traceability requirements to aquaculture-raised seafood, *see id*. at 31–32.  Because the court can reasonably discern the agency's path as to each of these decisions, the court rejects Plaintiffs' challenges.

a.      Did the Department Establish a Sufficient Link Between the Rule and Combating IUU Fishing and Seafood Fraud?

Contrary to Plaintiffs' assertion, *see* Pls.' Mot. at 24–25, there is ample evidence in the record to support the agency's position that the traceability program will help deter IUU fishing and seafood fraud.  To begin, the IUU Task Force made clear in its Action Plan that "[i]t is in the national interest to prevent the entry of illegal goods, including illegally harvested or produced seafood, into U.S. commerce.  Creating an integrated program that better facilitates data collection, sharing, and analysis among relevant regulators and enforcement authorities would be a significant step forward in addressing IUU fishing and seafood fraud."  A.R. at 013134; *see also id*. 006909 (noting the same in the Final Rule).  Thus, from its inception, the Rule was premised on the idea that traceability programs provide an effective means to combat IUU fishing and seafood fraud.

The administrative record only bolsters that determination.  *See id*. 000046–60, 000357–68, 002602–29.  The record contains multiple academic and industry studies that emphasize the importance of traceability to reducing IUU fishing and seafood fraud.  For instance, the agency relied on a 2014 paper prepared by the Global Food Traceability Center,  which found "[t]here is

an urgent need for public and private seafood stakeholders to collaborate and develop a consensus on how to design, plan, test, and implement a global seafood traceability system" to prevent IUU fishing and seafood fraud. *Id*. at 000046, 000057; *accord id*. at 000056 ("Challenges for the seafood industry such as IUU fishing and seafood fraud will continue unless innovative, digital data solutions such as electronic traceability are pioneered and implemented."). The Global Food Traceability Center also communicated several "key points" to the IUU Task Force, including that a "[k]ey to addressing illegal, unreported, unregulated (IUU) fishing and seafood fraud is the concept of commercial transparency. This transparency can be addressed by the implementation of traceability in the seafood industry." *Id*. at 000061, 000064. Another study from 2014, appearing in the journal *Marine Policy*, contains a comprehensive analysis of the problem of IUU fishing and seafood fraud in the United States and determined that the "use of catch documentation, improved chain of custody procedures and certified product sources [can] ensure that seafood imports are traceable to verifiably legal sources." *Id*. at 000357, 000366. Yet another study, prepared by Oceana, Inc., in 2012, analyzed the problem of seafood fraud in New York and, after finding that "[s]eafood fraud is certainly alive and well in the New York City area," concluded that "[f]ull traceabilty of the seafood supply chain is needed to ensure that only safe, legal and honestly labeled fish is sold in the U.S." *Id*. at 002643, 002653. The Department also received and considered additional reports indicating that seafood traceability deters poachers from engaging in illegal fishing. *Id*. at 002623–24. In sum, there is no shortage of literature in the administrative record demonstrating the important role a traceability system can play in addressing the problems of IUU fishing and seafood fraud.

Various stakeholders echoed that very point during notice-and-comment periods. For example, Intervenor-Defendant stated that it was "in favor of a more effective documentation

regime, including the use of electronic data and more specific product description requirements."
*Id.* at 000193–94. Thirteen consumer protection and public health organizations expressed the same view, writing that "[t]raceability information should be required for all seafood sold in the U.S." *Id.* at 000289, 000290. Thus, the record shows that even disparate interests supported the agency adopting a traceability program to reduce IUU fishing and seafood fraud.

Finally, the Department's decision-making was informed by the early success of the European Union's Catch Documentation Program in reducing IUU fishing and seafood fraud in the European Union. *Id.* at 006914. For instance, a paper contained in the administrative record observed that, in a short time, the European program "has already started to change the behaviour and practices of IUU operators." *Id.* at 007364. Thus, the Department also looked to a real-world example demonstrating the benefits of a traceability regime.

Based on the above evidence, the court can easily discern the Department's rationale for adopting a traceability rule to combat IUU fishing and seafood fraud. *Id.* 006907, 006916; *see also State Farm*, 463 U.S. at 43. The Rule, therefore, is not arbitrary and capricious on this ground.

b.    <u>Did the Department Rely on Insufficient Data in Developing the Priority Species List?</u>

Plaintiffs next contend that the Department relied on insufficient data in developing the priority species list. That contention, while similar to Plaintiffs' prior claim that the Department *procedurally* violated the APA by failing to disclose data underlying the priority species list, raises a *substantive* challenge that the Rule is arbitrary and capricious because its priority species designations relied on insufficient data. Their argument is twofold. First, Plaintiffs maintain that the Department did not have any data linking particular species to seafood fraud when developing

the priority species list, and yet still considered seafood fraud as a relevant risk factor.[16]  *See* Pls.'

Mot. at 28–29.  Second, Plaintiffs argue that the Rule designated four priority species—Atlantic

cod, Pacific cod, red snapper, and blue crab—for which the agency had no data at all.  *See id*. at

32.  Plaintiffs therefore insist that there is "no basis in the administrative record to support the

selection of the specific species to be governed by the rules."  *Id*. at 24.  Actually, the administrative

record shows otherwise.

To begin, Plaintiffs, again, point to isolated e-mails in the record to bolster their claim, *see*

*id*. at 28–29, including the following intra-Department communications:  (1) in May 2015, an

agency employee wrote that "[w]e don't track 'fraud' per se.  We have FDA referrals, which are

mostly decomposition and none referred recently for mislabeling or short weight," *see* A.R. at

00032019; (2) in June 2015, two Department regional offices replied to that e-mail chain and

indicated that they did not have seafood fraud data tracking systems in place as of the e-mail date,

*see id*. at 00032018–19; and (3) an agency employee stated, in separate June 2015 e-mails, "there

are may [sic] complications [in attempting to ascertain imports by species], most importantly the

fact that most products are not reported to the species level," and because "most products in the

[import] trade data are not specified to the species level," *see id*. at 00023942–43.  Each e-mail,

however, represents a snapshot in time, showing an ongoing agency process of collecting and

analyzing data and Department personnel, quite appropriately, raising questions about the

sufficiency of the information collected.  That is precisely what an agency is supposed to do when

rulemaking.  In any event, these isolated employee statements cannot disprove the Department's

---

[16] Plaintiffs further contend that the Department's lack of evidence concerning seafood fraud "shows that the agency was either unaware or ignored that DNA testing is used to confirm the identity of species . . . [and so the agency] failed to consider [DNA testing] as a viable, less costly, option for combating seafood fraud."  Pls.' Mot. at 29.  For reasons that will become apparent, that argument fails both because the Department did consider evidence of seafood fraud when designating priority species, and it also fulfilled its obligations to consider less costly regulatory alternatives under the Regulatory Flexibility Act.  *See infra* Part IV.D.

actual justifications for the Rule, as published in the Federal Register. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007) (instructing courts to focus on final agency action, not interim employee decisions, when evaluating whether an agency's rulemaking was arbitrary and capricious).

Plaintiffs also appear to contend that the data relied upon by the Department was deficient because it was not *statistical* data. *See* Pls.' Mot. at 28–29. That argument is flawed for two reasons. First, in light of the redactions to the At-Risk Matrix, the court cannot conclude, as Plaintiffs contend, that the agency did not rely on *any* statistical data when promulgating the Rule. Second, even if the Department did not rely on statistical data, that omission is not fatal. Nothing in the APA mandates that an agency's rulemaking must incorporate statistical evidence. To the contrary, an agency need only "examine the *relevant* data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (emphasis added) (internal quotation marks omitted). Such "relevant data" can include policy considerations as well as agency and outside expertise. *See Ctr. for Auto Safety v. Federal Highway Admin.*, 956 F.2d 309, 316 (D.C. Cir. 1992); *Nat'l Tour Brokers Ass'n v. Interstate Commerce Comm'n*, 671 F.2d 528, 533 (D.C. Cir. 1982). That is precisely what the Department did here. It collected available data concerning seafood fraud from within the Department, as well from other agencies, and relied on that data, in conjunction with the advice of subject-matter experts, to populate the priority species list. The Department then explained the reasons for its selections, including by detailing its assumptions and inputs, on the public record. A.R. at 004467–68; *see also supra* Part IV.C.1. The APA does not require an agency to do any more.

Plaintiffs also submit that the Department designated certain species—namely, Atlantic cod, Pacific cod, red snapper, and blue crab—as priority species without supporting evidence. Again, Plaintiffs focus on the agency's failure to present "data"—by which they mean statistics—about those species. However, as discussed above, the agency was not required to rely on statistical data to devise the priority species list; it was entitled to rely on other factors, such as the subject-matter expertise of agency actors and other industry stakeholders. The Department did just that regarding these four species. For instance, with respect to Atlantic cod, the Department relied on the expertise of the NOAA Working Group, which found, among other things, that "Atlantic Cod is a high value groundfish . . . that can easily be substituted with lower quality meat. . . . [and] has a known history of seafood substitution" in the United States. A.R. at 00040353, 00029128–30. That fact, standing alone, establishes a rational basis for designating Atlantic cod as a priority species. *See State Farm*, 463 U.S. at 43. Moreover, concerning red snapper, the Department received and considered the results of a quantitative study commissioned by Oceana, Inc., which found that "[e]ighty-nine percent of the snappers sampled from grocery stores were mislabeled, as were 77[%] from restaurants," and that 93% of those red snapper sampled for the study were mislabeled. A.R. at 003093–94. Finally, the At-Risk Matrix contains enough information concerning blue crab—e.g., recent cases where foreign blue crab was labeled as Maryland crab—and Pacific cod—e.g., FDA alerts concerning instances where pollock was substituted—to allow the court to discern the Department's reasons for their inclusion on the priority species list. *See id*. at 00052106–07.

Plaintiffs also raise the related argument that, to the extent the Department relied on data in designating those four species as priority species, it failed to disclose the "nature, number or source of [the] reports" upon which it relied, leaving the public unable "to assess the validity of

those reports." Pls.' Mot. at 32. The court, however, already has rejected Plaintiffs' related argument that the Department violated the APA in failing to disclose the law enforcement data underlying the priority species list because Plaintiffs failed to demonstrate prejudice arising from the non-disclosure. Plaintiffs offer no more specific evidence of prejudice in this context. Plaintiffs therefore have failed to show that the agency's non-disclosure of data regarding those four species violated the APA.

In sum, the court is satisfied that there is a "rational connection" between the evidence contained in the administrative record and the selection of priority species. *See State Farm*, 463 U.S. at 43. Accordingly, the court finds that the Department's development of the priority species list was not arbitrary and capricious.

c.     <u>Did the Department Have Sufficient Evidence to Support Regulating Aquaculture-Harvested Seafood?</u>

Lastly, Plaintiffs charge that the Department failed to provide sufficient justification for applying the Rule to aquaculture-harvested seafood, that is, farm-raised seafood, because it presented no information indicating that "seafood raised through aquaculture are *as at risk* for mislabeling as seafood caught in the wild." Pls.' Mot. at 31 (emphasis added). The Department, however, was not under an obligation to demonstrate that the mislabeling risks associated with aquaculture-harvested seafood are equal to that of wild-caught seafood—all that matters is whether the agency articulated a rational basis for concluding that there was sufficient risk associated with farm-raised seafood to justify regulating its import under the Rule. *See State Farm*, 463 U.S. at 43. The court finds that it did.

Although the Department candidly admitted that "that IUU fishing is not a concern directly related" to farm-raised seafood, the Department nevertheless determined that subjecting such products to the Rule was necessary to advance the Department's broad mandate of stamping out

55

IUU fishing and seafood fraud worldwide. A.R. at 006909. The Department offered several reasons for that conclusion. First, the Department explained that excepting farm-raised seafood from traceability requirements would frustrate the Rule's enforcement goals, as IUU fishermen could combine wild-caught IUU seafood—some of which is "indistinguishable in product form" from its farm-raised counterpart—with farm-raised seafood for import in order to circumvent the Rule's traceability requirements. *Id*. In other words, IUU-caught seafood could be smuggled into the country under the guise of farm-raised seafood. Second, the Department noted that aquaculture is "likely to be subject to foreign laws or regulations pertaining to licensing and reporting on production and distribution" and so subjecting it to the Rule would further effectuate the agency's authority under the MSA to prevent seafood harvested in violation of law from entering the United States. *Id*. Finally, the Department pointed to "evidence . . . that aquaculture products have been subject to various types of product misrepresentation, some of which can cause risk to human health." *Id*. And the administrative record supports that assertion. *See, e.g.*, *id*. at 002646 (noting instances of Taiwanese farm-raised tilapia, which is subject to less stringent regulation, being substituted for wild-caught snapper). In light of such evidence, the Department concluded that, "[a]s is the case for wild capture fisheries, collecting information on the origin of aquaculture products supports the determination of conformance with foreign law or regulation, including the determination that the fish products are not fraudulently misrepresented." *Id*. at 006909. Thus, the Department provided a reasoned explanation for why regulating farm-raised seafood promotes the Rule's overarching regulatory goal of preventing IUU-caught and/or mislabeled seafood from entering the United States.

Accordingly, the court finds that the agency's decision to subject aquaculture-harvested seafood products to the Rule does not violate the APA. *See State Farm*, 463 U.S. at 43.

The court moves now to Plaintiffs' challenge to the Department's estimate of costs associated with complying with the Rule.  Specifically, Plaintiffs take issue with the agency's finding that international seafood suppliers will not pass onto U.S.-based importers the additional informational and reporting costs that the suppliers will incur to assist importers in complying with the Rule's traceability requirements.  *See* Pls.' Mot. at 25–27, 36–37; Pls.' Reply at 30–32.  In their view, upstream exporters of seafood will pass their "supply side" costs to downstream importers, thereby increasing the costs of compliance for such U.S.-based entities.  Plaintiffs criticize the agency's contrary conclusion as "internally inconsistent" and at odds with the underlying evidence.  Pls.' Mot. at 25–26.  They advance three specific contentions to support their criticism.  The court finds none of them persuasive.

Plaintiffs first assert that the agency's costs assessment cannot be reconciled with a study that they contend the agency heavily relied upon to conduct its Final Regulatory Flexibility Analysis ("FRFA").[17]  The study in question, *Price Premiums for Providing Eco-Labelled Seafood*, was authored primarily by a Swedish economist, Johan Blomquist, and appeared in the Journal of Agricultural Economics in 2015 (the "Blomquist Study" or "the Study").  Johan Blomquist, et al., *Price Premiums for Providing Eco-labelled Seafood: Evidence from MSC-certified Cod in Sweden*, 66 J. AGRICULTURAL ECON. 690 (2015) [hereinafter Blomquist Study].  The Blomquist Study examined the price effects of a seafood labeling program in Sweden sponsored by the Marine Stewardship Council ("MSC"), a non-profit entity advocating sustainable fishing.  *Id.*  Under that program, the MSC grants qualifying seafood fisheries that document their supply chain an "eco-label," indicating to consumers that the catch was sustainably harvested.  *See*

---

[17] The court addresses Plaintiffs' challenge to the Department's FRFA in Part IV.D.

*id.* at 690–91; A.R. at 006935. The purpose of the Study was "to analyze the price premium achieved by fisher[men] for providing eco-labelled seafood." Blomquist Study at 691. Using cod as its exemplar, the study found that there was a 10% price premium for frozen cod fillets sold in Sweden, *id.* at 694, but that the price premium did not inure to the benefit of the eco-labeled fisheries, *id.* at 699, 701–02. Based on that conclusion, Plaintiffs argue that the agency's insistence that documentation systems in the European Union did not result in measurable increases in the cost of seafood is incorrect, when in fact similar programs increased prices as much as 10%. The Blomquist Study, Plaintiffs further contend, undermines the Department's finding, contained in its FRFA, that the estimated industry-wide annual compliance cost—approximately $6 million to $18 million—amounted to less than one percent of the overall annual value of imported seafood products—$9 billion. Pls.' Mot. at 26 (citing A.R. at 006935). According to Plaintiffs, the 10% price premium identified by the Study shows the Rule will result in compliance costs totaling 10% of the annual value of seafood imports, rather than the less than one percent increase estimated by the Department. *Id.*

Plaintiffs' showcasing of the Blomquist Study makes a mountain out of a molehill. The Study is not inconsistent with the agency's cost conclusions for several reasons. First, and most obviously, the Blomquist Study concerns a specific eco-labeling program, with its own distinct goals and requirements, not the E.U. traceability program, and for that reason alone cannot carry the weight Plaintiffs attribute to it. Second, even if one could analogize the eco-labeling program to the Rule, the Blomquist Study does not have anything to do with supply-side costs; indeed, supply-side costs are irrelevant to the Study because the costs of complying with an eco-labeling program are not sent "downstream," but are borne entirely by the fisheries themselves. Blomquist Study at 692. Third, the Blomquist Study does not support Plaintiffs' assertion that the

10% consumer price premium for eco-labeled cod is attributable to the costs of complying with the eco-labeling program. The Blomquist Study makes no such finding and, if anything, suggests that the price premium is attributable to "high demand" for eco-labeled food products by "swedes [who] seem to be environmentally concerned consumers." *Id*. at 693. Finally, the Department did not cite the Blomquist Study to support the conclusion that the E.U. traceability program did not "result[] in measurable increases in the cost of seafood." A.R. at 006939. Rather, the agency's FRFA study cites the Blomquist Study only once, in a section titled "Economic Impacts," for the limited proposition that, "[i]t should also be noted that evidence exists of consumer willingness to pay premiums at the retail level for fishery products of certified and sustainable origin." *Id*. at 006935 & n.6. Thus, the Blomquist Study is only marginally relevant to the Department's compliance cost estimates and is not at all inconsistent with the agency's conclusion that international suppliers of seafood will not pass on costs of compliance to U.S.-based importers.

Next, Plaintiffs assert that the agency's position on costs is inconsistent with a statement in the Rule's preamble that suppliers' costs "may be either passed through to U.S. consumers or result in a decline in exports to the U.S. [market]." Pls.' Mot. at 26 (quoting A.R. at 006918). Plaintiffs, however, take that statement out of context. The full statement reads:

> There are few affected countries not currently exporting the designated priority species to the E.U. market, suggesting compliance with the U.S. requirements would not pose an inordinate burden on U.S. importers or consumers given the relatively small volume of trade involved. We note, however, that individual businesses located within each country may have different levels of experience with exporting to the EU market. While this analysis assumes minimal incremental regulatory burden for businesses located in countries that ship to the EU, it is possible that some businesses within these countries will incur costs as a consequence of this rule, in particular the chain-of-custody recordkeeping in cases of complex supply chains, that *may be either passed through to U.S. consumers or result in a decline in exports to the U.S. market*. Both of these responses to the Program could affect prices in the U.S.

> market. However, evidence indicates that there were not significant
> effects on supply to the EU seafood market in response to the EU's
> IUU regulation.

A.R. at 006918 (emphasis added). Taken in full, the preamble is not at all inconsistent with the

Department's assumption that—based on suppliers having already incurred costs to comply with

the E.U. traceability program—supply-side costs would not increase *materially* for U.S. importers.

The Department simply noted the possibility that those businesses with little or no experience

complying with the E.U. system may incur increased costs as they adapt to the U.S. market's

adoption of a traceability scheme. *Id.* Those costs would not be significant, however, given the

"small volume of trade involved." *Id.* Thus, Plaintiffs fail to convince the court that, based on

one statement taken out of context, the Department failed to evince "a rational connection between

the facts found and the choice made." *See State Farm*, 463 U.S. at 43 (internal quotation marks

omitted).

Third, Plaintiffs complain that the agency's belief that the Rule's implementation will have

a limited effect on supply-side costs is "not the result of any independent assessment, but rather

nothing more than an assumption that appears to be inconsistent with the results of the Swedish

study relied upon by the agency." Pls.' Mot. at 27. For the reasons already discussed, there is

nothing inconsistent about the agency's cost assessment and the Blomquist Study. Nor can the

agency's view on supply-side costs be cast aside as a mere "assumption." To the contrary, the

Department provided a "reasoned analysis" regarding the anticipated impact of supply-side costs.

The Department explained in the Federal Register that "70[%] or more" of the seafood products

imported into the United States come from exporters subject to the E.U. traceability program. *See*

A.R. at 006937. Based on that fact, the Department continued, "it can be expected that compliance

with [the Rule's] reporting requirements would not be a significant burden for exporters already

compliant with" the E.U. program. *Id.* Further, the Department calculated the total value of seafood imported from countries that *do not* export to the E.U.—Bahrain, Barbados, Brunei, St. Vincent-Grenadines, and Turks and Caicos. That total value was approximately $3.6 million in 2014, a drop in the bucket when compared to the approximately $9.34 billion dollar total value of the seafood export market for that same fiscal year. *See id.* at 006959, 006961. Admittedly, the Department's cost analysis does rest on an important assumption—namely, because both the E.U. and U.S. traceability programs require importers to collect substantially similar categories of information, seafood suppliers to both markets will incur only marginal additional expenses to facilitate the transmission of that information to their U.S.-based customers. Agencies are, however, allowed to rely upon assumptions when formulating a rule, so long as those assumptions are sound and not contradicted by real-world evidence. *Cf. Nat'l Tour Brokers Ass'n*, 671 F.2d at 533 (holding that "an agency may rely on its experience to provide the necessary factual support for [rulemaking decisions] so long as that experience is made part of the record and susceptible to judicial review" (internal quotation marks omitted)). Here, Plaintiffs point to no evidence—the Blomquist Study certainly provides none—that conflicts with the agency's assumption.[18] Accordingly, the court finds that the Department made its supply-side cost estimates by "examin[ing] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43 (internal quotation marks omitted).[19]

---

[18] Plaintiffs' reliance on the Medicare Malpractice Rule cases proves unhelpful. *See* Pls.' Mot. at 27. Those cases, led by the Third Circuit in *Abington Memorial Hospital v. Heckler,* invalidated the Medicare Malpractice Rule as improperly promulgated under the APA because, among other things, the regulation was adopted based on a study later shown to be incorrect. *See* 576 F. Supp. 1081, 1086–87 (E.D. Pa. 1983), *aff'd* 750 F.2d 242 (3d Cir. 1983). For the reasons discussed, no such problem exists here.

[19] The same goes for Plaintiffs' contention that the Department failed to comply with the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501–3521, which requires agencies to assess and report costs associated with a proposed regulation's "annual recordkeeping and reporting" requirements. *See* Pls.' Mot. at 30–31. The fact that the

## 4.    Is the Compliance Date Unduly Burdensome?

As their final argument under the APA, Plaintiffs assert that the Rule's "compliance date" of January 1, 2018—that is, the date enforcement of the Rule's record-keeping requirements will commence—is overly burdensome. *See* Pls.' Mot. at 32–33. Specifically, Plaintiffs maintain that only providing one year between the Rule's effective date—January 9, 2017—and its compliance date—January 1, 2018—"create[s] an expensive set of problems that the agency appears to have intentionally ignored, namely that large quantities of seafood were caught domestically and exported *before* the Final Rule was issued and will not reenter the United States until *after* the compliance date." *Id*. at 33 (emphasis added). That lag time of over a year, Plaintiffs continue, "will cost domestic fishermen tens of millions of dollars in fish that cannot be re-imported because of the absence of" the required traceability documentation. *Id*. As a result, Plaintiffs contend that the fairer course, as suggested by one Department employee, would be for the Rule only to apply to seafood "harvested on a fishing trip that began on or after 60 days" after the Rule went into effect. *Id*. (quoting A.R. at 020257).

Plaintiffs' expressed preference for a different compliance date does not give rise to a violation of the APA. For one, Plaintiffs offer no record support for their contention that it can take a year or more before some domestically harvested seafood is re-imported into the United States, or that the value of such seafood is "tens of millions of dollars." *Id*. at 33. Thus, there is no evidence that the Department ignored the adverse economic consequences that Plaintiffs claim in setting the Rule's compliance date.

---

Department did not provide identical cost estimates in each of its PRA filings does not, as Plaintiffs contend, "undermin[e] the credibility of the rulemaking." *Id*. at 30. To the contrary, the revised cost estimates evidence the purpose of notice-and-comment rulemaking—to enable the public to affect the agency's decision-making. Here, the agency consistently revised both its cost and hours estimates upwards in response to comments during the rulemaking period. In fact, as Plaintiffs themselves note, the Final Rule adopted higher estimated costs than both the Department's earlier PRA submissions. A.R. at 006927. Without more, a mere upward cost estimate revision does not constitute a violation of the PRA.

Second, the record demonstrates that the Department clearly weighed public comment concerning the proposed compliance date, and made the reasonable determination that a one-year period provides sufficient time for government agencies to develop the software designed to receive traceability data, for importers to test entering the required data into the software, and for international suppliers to establish systems to convey the required data.  A.R. at 006914–15; *see also id*. at 006953.  The Department also addressed concerns, similar to those Plaintiffs raise here, surrounding seafood that is domestically harvested before the compliance date but imported back into the United States after that date.  The Department explained that it

> [had] evaluated the time interval from harvest date to entry date for several fish products currently subject to import monitoring programs . . . and determined that in most cases U.S. imports occur within a few months of the harvest event.  Some products may be in the supply chain for longer periods due to processing, cold storage and shipping time.  U.S. importers should work with their suppliers in advance of the compliance date of January 1, 2018 to ensure that the required information is available.

*Id*. at 006915.  Thus, in setting the Rule's compliance date, the agency determined that a one-year interval between effective and compliance dates was a sufficient amount of time for importers to make the preparations necessary to ensure that the traceability data for seafood harvested in the months before the compliance date would be available to importers for entry after the compliance date.  The agency addressed the very concern Plaintiffs now raise and gave a rational explanation for why that concern did not necessitate a different compliance date.

The court therefore finds the agency's setting of the Rule's compliance date was not arbitrary and capricious.

*       *       *

In summary, the court rejects Plaintiffs' various contentions as to why the Rule's promulgation violates the APA and finds that the Department did not act arbitrarily and capriciously in issuing the Rule.

**D.     Did the Department Satisfy the Requirements of the Regulatory Flexibility Act?**

At last, the court arrives at Plaintiffs' challenges to the Department's analyses required under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612.  *See* Pls.' Mot. at 34–37.  The RFA requires agencies issuing regulations likely to have a "significant impact" on "small entities" to prepare both an initial regulatory flexibility analysis ("IFRA") and a final regulatory flexibility analysis ("FRFA"), whose purpose is to estimate the financial impact of new regulations on small businesses and to ensure the issuing agency makes all reasonable efforts to minimize that impact. 5 U.S.C. §§ 603, 604(a); *see also U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). The issuing agency must make its FRFA available to the public, and publish either the FRFA in its entirety, or a summary thereof, in the Federal Register.  5 U.S.C. § 604(b).  The FRFA must contain the following five elements:  (1) the need for, and purpose of, the rule; (2) evidence that the agency considered the public and Small Business Administration comments received during the notice-and-comment period; (3) an estimate of the number of affected small entities; (4) the estimated compliance requirements imposed by the rule and their attendant costs; and (5) evidence that the agency sought to ameliorate the economic impact of the rule on small entities, including the agency's reason for selecting the final rule, as opposed to other available regulatory alternatives.  *Id.* § 604(a)(1)–(6).  Courts reviewing challenges to the adequacy of an agency's FRFA employ the "arbitrary and capricious" standard used under the APA.  *Id.* § 611(a)(1)–(2)

(noting that courts review agency action under this chapter "in accordance with chapter 7"—"judicial review"); *see Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540–41 (D.C. Cir. 2009).

Although the RFA compels an agency to make substantive determinations, a court cannot find an agency violated the RFA merely because it disagrees with those determinations. *See Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540. The D.C. Circuit has made clear that the RFA is a "[p]urely procedural" statute that only requires an agency to engage in a "reasonable, good-faith effort to carry out [RFA's] mandate." *U.S. Cellular Corp.*, 254 F.3d at 88 (alteration in original) (internal quotation marks omitted); *Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 178 (D.C. Cir. 2007) (noting that the RFA is procedural and sets forth particular steps an agency must complete). Thus, in assessing the adequacy of an FRFA, courts look to see whether the agency made a reasonable attempt to address all five required elements in its FRFA, and do not measure the FRFA under a standard of "mathematical exactitude." *See Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997); *see also Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540 (holding that the agency's RFA analysis complied with the requirements of the Act, because the analysis at issue "undoubtedly addressed all of the legally mandated subject areas"); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 96 (D.D.C. 2007) (holding that an agency's "attempt at almost step-by-step compliance" with the RFA—tracking the statute's requirements "subsection-by-subsection"—demonstrates, at a minimum, sufficient compliance with the "reasonable, good faith effort" requirement outlined by the D.C. Circuit (internal quotation marks omitted)).

Plaintiffs argue that the Department failed to comply with the requirements of the RFA for several reasons. As an initial matter, Plaintiffs complain that the agency failed to publish its IRFA in the Federal Register. Pls.' Mot. at 7; Pls.' Reply at 33. That argument is a nonstarter because, even if true, the court lacks jurisdiction to consider challenges to an agency's IRFA. *Allied Local*

& *Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) (holding the court does not have jurisdiction to consider an agency's IRFA, because "[s]ection 611(a) specifically lists the sections of the RFA subject to judicial review, and section 603 is not on the list"); *see also U.S. Cellular Corp.*, 254 F.3d at 89. Next, Plaintiffs assert that the FRFA—which is subject to judicial review— falls short because (1) "NMFS failed to take into account the most significant cost component of the Final Rule—the costs of the change in which seafood must be processed overseas in order to preserve traceability data required under the Final Rule as well as the cost of the loss of fish harvested and exported before the Final Rule was published," *see* Pls.' Mot. at 34, and (2) "NMFS was aware of, but did not consider a fourth alternative [to the Rule]—developing new or adapting existing technologies to better identify and track IUU fishing," as well as DNA testing. *Id*. at 37.

The court need not dwell on either argument for too long. As to the first claim, the court already has found that the agency's compliance cost estimates are based on a reasoned analysis in compliance with the APA. It necessarily follows that the agency's cost estimates also pass muster under the RFA. *See U.S. Cellular Corp.*, 254 F.3d at 89; *Associated Dog Clubs of N.Y. State, Inc. v. Vilsack*, 75 F. Supp. 3d 83, 94 (D.D.C. 2014).[20] With regard to Plaintiffs' second contention that the agency did not consider alternatives, the record shows otherwise. The RFA only requires that the agency provide a discussion of "*significant* alternatives to the rule considered by the agency which affect the impact on small entities" and explain why each of those alternatives was rejected. 5 U.S.C. § 604(a)(6) (emphasis added). Thus, agencies are not required to address all

---

[20] *Aeronautical Repair Station Association, Inc. v. Federal Aviation Administration*, 494 F.3d 161 (D.C. Cir. 2007), does not resuscitate Plaintiffs' argument. *See* Pls. Mot. at 36. That case concerned an agency's decision not to prepare an RFA analysis on the basis that the small businesses at issue were not the direct object of the agency's regulation. *Aeronautical Repair Station Ass'n, Inc.*, 494 F.3d at 175. Not so here. There is no dispute that the Department in fact completed an FRFA. Further, the FRFA also contemplated incremental costs faced by indirectly regulated entities under the Rule, including processors, and concluded that many of these costs are likely to be insignificant because much of the industry is already in compliance with the Rule's recordkeeping requirements through the E.U. traceability program. A.R. at 006950–51. Thus, *Aeronautical Repair Station* does not change the court's conclusion that the FRFA adequately considered cost effects to small businesses.

potential alternatives in their FRFA.  *See Associated Fisheries of Me.*, 127 F.3d at 114–17.  Here, Plaintiffs do not explain why the alternatives they cite are "significant" or more reasonable alternatives on their own to combat IUU fishing and seafood fraud; nor do Plaintiffs contend that the agency failed to respond to public comments identifying their preferred alternatives.  *Cf. Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1042 (D.C. Cir. 2012); *Allied Local & Reg'l Mfrs. Caucus*, 215 F.3d at 80.  Rather, Plaintiffs merely point to two discrete pages within a vast administrative record that make passing reference to SeaVision, a new GPS-driven technology, and DNA testing, and declare that those pages evidence a failure to consider "significant" alternatives.  Pls.' Mot. at 37 (citing A.R. at 029565, 032018).  Such a meager citation to the record simply cannot upend the deference due to the Department under the RFA.

The court is satisfied that the Department engaged in a "good faith effort" to consider "significant" alternatives under the RFA.  *See U.S. Cellular Corp.*, 254 F.3d at 88.  For those reasons, the court finds that the Department fulfilled the requirements of the RFA in promulgating the Rule.

## V.    CONCLUSION

In the end, the Rule weathers the storm of Plaintiffs' various challenges.  The court therefore upholds the Rule and, for the foregoing reasons, grants Defendants' Cross-Motions for Summary Judgment and denies Plaintiffs' Motion for Summary Judgment.

A separate Order accompanies this Memorandum Opinion.

Dated:  August 28, 2017                                        Amit P. Mehta
                                                               United States District Judge